**SPALDING & SON, INCORPORATED, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Cong. Ref. No. 2–86.**

United States Court of Federal Claims.

May 10, 1993.

William K. Olivier, Washington, DC, with whom were Asst. Director Thomas W. Peterson, Director David M. Cohen, and Asst. Atty. Gen. Stuart M. Gerson, for defendant. Anthony H. Anikeeff, Washington, DC, of counsel.

Before the Review Panel: JOHN P. WIESE, Presiding Judge, JAMES F. MEROW, and ROGER B. ANDEWELT, Judges.

## REPORT OF REVIEW PANEL

WIESE, Presiding Officer.

Senate Resolution No. 458 referred to this court a pending bill, S. 294, 99th Cong., 1st Sess. (a bill "For the relief of Spalding and Son, Incorporated") for consideration in accordance with the procedures called for by 28 U.S.C. §§ 1492 and 2509 (1988). As contemplated by these provisions, the matter was assigned to a judge of this court (sitting as a hearing officer) who, after trial of the issues, filed a lengthy report setting forth findings of fact and legal conclusions favoring monetary relief for Spalding through enactment of the pending bill. 24 Cl.Ct. 112.

The hearing officer's report is now before this Review Panel on defendant's appeal. The essence of the appeal is that the hearing officer erred as a matter of law in finding grounds for relief. Extensive briefs have been filed on the issues raised and oral argument was heard by the Review Panel on February 5, 1993. For the reasons stated below, we conclude that the facts do not demonstrate a basis for relief, either as a matter of law or as a matter of equity, and accordingly recommend against enactment of S. 294.

## FACTS [1]

Spalding & Son, Inc. (Spalding) is a family-owned corporation that runs a logging and sawmill operation in Grants Pass, Oregon. The company, which has been in business since the 1950's, relies primarily on

Gary G. Stevens, Saltman & Stevens, P.C., Washington, DC, Atty. of Record, for plaintiff. Kevin R. Garden, of counsel.

---

[1] Unless otherwise stated, the facts noted in this report are taken from a pretrial stipulation of the parties and the hearing officer's additional findings of fact.

federal timber sale contracts to supply its logging and milling needs.

In 1976, the Department of the Interior, acting through the Bureau of Land Management (BLM), solicited bids for the harvesting of timber on a tract known as the Jamison–Harris parcel. This sale, identified by that same name—the Jamison–Harris sale—was undertaken as part of the agency's statutory responsibilities to provide for the sale of federally-owned timber on a competitive award basis. The Jamison–Harris sale involved a partial-cut contract, meaning that only specifically designated trees were to be harvested, i.e., those marked with blue paint both above and below the stump line; unmarked trees were reserved from cutting.

The solicitation for the Jamison–Harris sale indicated that approximately 13,208 trees, representing an estimated volume of 11,206 merchantable thousand board-feet (MBF), had been marked for cutting.[2] The sale was divided into four subsales, designated respectively A, B, C, and D. The estimated volume for each subsale was set forth in the solicitation.[3] The solicitation intended that subsale D be clear-cut so as to permit that area's use for construction of a right-of-way.

Spalding was the high bidder at the Jamison–Harris auction and thus was awarded the contract.[4] The award date was January 11, 1977. Operations began in the spring of that year and by late summer of 1977 Spalding had completed the clear-cutting of subsale D and the required con-

struction of the right-of-way. Under Spalding's harvesting plan, timber removal from the remaining areas was to begin the following year.

In August of 1978 an arsonist set fire to the timber lands adjacent to the Jamison–Harris sale area. The ensuing blaze, which came to be known as the Grave Creek Fire, burned for three days before being extinguished. Parts of the Jamison–Harris tract were damaged by this fire. Although subsale A was the area within the Jamison–Harris tract most heavily burned, nevertheless, only one to two percent of that unit's trees were completely destroyed. The rest, though in fact killed, were still standing after the fire and remained merchantable. The fire did, however, blacken the trunks of roughly half of the trees in subsale A thereby obscuring their blue paint markings and consequently making identification of the trees originally marked for cutting impossible. This obliteration of markings was confined principally to the western reaches of the subsale.

In addition to the loss of tree markings, the much larger problem confronting BLM officials was the rehabilitation of the forest. To begin that process, all damaged trees would have to be removed from the burned-over areas. Moreover, this removal operation needed to be accomplished within the time constraints of the upcoming cutting season (spring-fall 1979) lest rot, staining and bug infestation destroy the market

---

2. Merchantable thousand board-feet is a timber industry standard for measuring volume. The term "merchantable" describes trees that are suitable for the production of timber products such as lumber.

3.

| Subsale | Volume in MBF |
|---------|---------------|
| A | 4,045 |
| B | 2,521 |
| C | 4,011 |
| D | 629 |
| Total | 11,206 |

4. Spalding's bid of $1,287,010.25 was a composite figure—the sum of the volume-extended totals of four separate prices, each covering one of the four timber species involved in the sale. The bid breakdown was as follows:

| Species | Estimated Volume | Bid Price | Volume Times Bid Price |
|---------|------------------|-----------|------------------------|
| Douglas Fir | 8,337 | 110.00 | 917,070.00 |
| Ponderosa Pine | 2,096 | 116.70 | 244,603.20 |
| Sugar Pine | 448 | 192.10 | 86,060.80 |
| Incense Cedar | 325 | 120.85 | 39,276.25 |
| TOTAL | 11,206 | | $1,287,010.25 |

value of the damaged trees.[5] The urgency of the situation is highlighted in an environmental assessment report that was prepared by BLM some weeks after the fire. On the question whether removal of the trees from the severely burned areas was the appropriate course of action for BLM to pursue, this report noted that "delay of action would result in significant losses in soil productivity due to erosion and also a probable epidemic insect infestation destroying millions of board feet of timber. Thus, it was clear to all that the harvesting plan originally conceived for subsale A—selective cutting only—would have to be changed to allow for clear-cutting, i.e., the removal from subsale A of all fire-affected trees. The more fundamental concern, however, was how to accommodate Spalding's contract interest in subsale A with the Government's new requirement for a clear-cutting operation—an operation that of necessity would extend well beyond the geographical boundaries of subsale A.

Upon initial consideration, local BLM officials identified three possible solutions to the difficulties facing them. The first was a proposal to re-mark the trees in the fire-affected portion of subsale A so as to re-create, by approximation, the contract's original volume estimate. The difficulty with this approach, and the reason it was not pursued by BLM, was that it would delay the harvesting of the remaining fire-affected timber on subsale A. That is to say, safety considerations precluded the conduct of two separate logging operations at the same site at the same time; hence, recovery of the non-contract timber from subsale A would have had to await the completion of Spalding's efforts on that unit. And, as we have indicated, the value of the fire-affected timber was largely dependent upon the timeliness of its removal.

The second proposal put forward was to modify the Jamison–Harris contract to permit Spalding to harvest all of the timber in subsale A with payment for the added volume to be based on actual board-foot measurements (in lieu of an estimated volume) at prevailing market prices. This proposal, while favored by Spalding, was rejected by BLM's regional staff for two reasons. First, BLM's timber sales had always been conducted on an estimated volume basis (i.e., pre-award estimates established through timber cruises verified by sample cuttings) rather than through so-called "scale" sales in which timber volumes are determined on the basis of log measurements made after cutting. Consequently, BLM had neither the experience, the personnel, nor, indeed, even the contract structure necessary to adopt the partial scaled sale approach contemplated by the proposal.

Second, under BLM's regulations, dispositions of timber in excess of 250,000 MBF (the case here), may be carried out on a non-competitive basis only if "[t]he contract is for the disposal of timber or other vegetative resources, for which it is impracticable to obtain competition." 43 C.F.R. § 5402.0–6 (1991). The view taken by BLM's regional staff was that any departure from the constraints imposed by this regulation would require approval from the national office and that, in turn, would require more time to accomplish than conditions at hand would permit.

The third proposal put forward—and the one ultimately adopted—involved the deletion from Spalding's contract of the fire-affected section of subsale A (representing roughly one half of that unit's timber volume) together with corresponding adjustments in contract price and appropriate credits for road construction costs. In concert with this proposal, BLM planned to include the deleted section in a separate solicitation—one that would cover all of the timber stands that had been damaged by the Grave Creek Fire.

---

5. During the oral argument of this case before the Review Panel, the point was made that harvesting of the burned-over timber could be postponed until the Spring of 1980, i.e., to the beginning of the second cutting season following the Grave Creek Fire of August, 1978. We do not find confirmation of this fact in the record. The two witnesses who addressed this point—Spalding's chief forester and BLM's resource area manager—shared the view that the harvesting of the timber had to be accomplished *before* the onset of the 1980 cutting season.

BLM considered the proposed modification of Spalding's contract both an efficient way to address its silvicultural concerns (*i.e.*, the need for prompt implementation of an area-wide clear-cut program) and a contractually sanctioned step to take. As to this last point, BLM's regional assistant solicitor was of the view that since the terms of Spalding's contract left title to uncut timber with the Government, the Government necessarily retained the power to dispose of that timber when obliteration of tree markings made performance of the contract impossible. It was on this ground then, along with the other reasons mentioned above, that BLM advised Spalding that a modification involving the deletion of part of the contract timber was the only available course of action.

On December 15, 1978, the Government forwarded to Spalding a proposed contract modification, Modification No. 5, that deleted from subsale A approximately 2,108 MBF of fire-affected timber—an amount representing roughly 17 percent of the contract's originally estimated volume. Spalding signed this modification. However, it did so only because it saw no better alternative. That is to say, Spalding did not question the correctness of BLM's decision from a contractual standpoint. Moreover, at an earlier time in BLM's examination of alternatives, the Agency had given thought to deleting the whole of subsale A from Spalding's contract rather than just a part. Assessed in light of that earlier considered possibility, Modification No. 5 was clearly the lesser of two evils and therefore won Spalding's reluctant endorsement.

Following the execution of Modification No. 5, BLM marked off all the Government-owned areas burned in the Grave Creek Fire, including the fire-affected portions of subsale A, and offered this combined area for sale as the Black Eye Salvage sale. Several bidders participated in the auction. Spalding, however, was not among them. Spalding did not participate because the volume of timber involved in the salvage sale (approximately 7.7 million board-feet), when added to the timber volume acquired under the Jamison–Harris sale, represented a total quantity beyond the company's capacity to process and market.

The Black Eye Salvage sale was sold to Boise Cascade Corporation by oral auction on February 22, 1979. The competitive bidding, which was confined to Douglas Fir, the principal species involved in the sale (comprising roughly 74 percent of the total), yielded a bid price of $200 per MBF—a figure considerably higher than the original bid amount of $110 per MBF that was returned to Spalding as a credit in Modification No. 5. It is this difference in amount—the spread between the dollar value credited to Spalding for the contract timber deleted from subsale A and the much higher value which the Government realized upon the resale of that same timber as part of the Black Eye Salvage sale—that ultimately prompted this quest for legislative relief. The essence of this suit is Spalding's belief that it, rather than the Government, is entitled to the benefit of the increase in market price that was realized upon the resale of the timber from subsale A.

Spalding's quest for relief did not begin immediately after the Black Eye Salvage sale. In fact, it was not until late November 1979, during the course of a general legal review of Spalding's timber business operations, that the subject of the Jamison–Harris sale and the impact of the Grave Creek Fire first came to the attention of Spalding's counsel. Although Spalding's assent to Modification No. 5 had never amounted to more than reluctant acquiescence, the company signed the modification without benefit of legal advice. With the issue having surfaced once again however, Spalding decided to have its attorneys look into the matter to see whether BLM's actions were correct and, if not, to advise on options that might be pursued to set the modification aside.

Following investigation of the matter, Spalding's counsel came to the conclusion that Modification No. 5 was premised on an incorrect interpretation of the contract. It was counsel's judgment that Spalding had been led to accept a resolution of the contract difficulties created by the Grave

Creek Fire that was neither contractually justifiable nor fair in its own right. But, this assessment notwithstanding, Spalding was advised that, because it had agreed to Modification No. 5, the prospects for a successful legal challenge to the modification were not bright. The best opportunity for relief, Spalding was told, lay in the pursuit of a private bill. That advice was accepted by Spalding and, after many months of effort, what resulted was the bill whose recommended enactment is the subject of the present appeal.

## DISCUSSION

Upon referral here of a bill for proceedings in accordance with 28 U.S.C. § 2509 (the congressional reference statute), the court is to determine the facts of the claim in question and advise Congress whether "the demand [presented in the bill] is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant." 28 U.S.C. § 2509(c). Our task then is to decide, on the basis of the facts recited earlier,[6] whether monetary relief for Spalding (through enactment of the referenced bill) is warranted as a matter of law or equity or would amount to no more than a gratuity. We proceed accordingly.

█ To start the discussion, we begin by noting that the words "legal claim" as used in the congressional reference statute imply no special meaning beyond the conventional understanding of that term: a claim based on the invasion of a legal right, that is "one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." *Tennessee Elec. Power Co. v. TVA*, 306 U.S. 118, 137–38, 59 S.Ct. 366, 369, 83 L.Ed. 543 (1939). In this case, of course, the legal claim is one founded on a contract.

As noted earlier, Spalding's claim is that the increase in timber prices that was realized upon the resale of the trees from subsale A represented a gain in market value that rightfully belonged to Spalding and not the Government. Underlying this position is the premise that, notwithstanding the change in circumstances attributable to the Grave Creek Fire, Spalding retained a right to harvest trees from subsale A equal to that unit's originally estimated contract volume. And based on this premise, the issue aired before the hearing officer was whether Spalding's relinquishment of part of this alleged right—its agreement to Modification No. 5—was the product of an informed and voluntary choice or the result of a mutual mistake of law and Government heavy-handedness.

The hearing officer thought the latter. He concluded, in substance, that BLM had other viable options, more favorable to Spalding than Modification No. 5, that could have been pursued and that BLM was guided largely by its own interests when it told Spalding that deletion of the fire-affected timber from subsale A was the only contractually permissible solution. Based on this assessment, the hearing officer went on to conclude that though it was "doubtful that Spalding has proven the existence of any viable legal claims … [n]evertheless, the facts clearly demonstrate the existence of several equitable claims." The grounds warranting such relief, according to the hearing officer, were essentially those alleged by Spalding, namely, mutual mistake of law and economic coercion.

Understandably, it is the correctness of the hearing officer's decision on these issues to which much of the appellate briefing has been directed. We, however, bypass those issues—at least for the moment. To the Review Panel, the controlling question in the case is not whether Spalding was improperly compelled to relinquish a contract right to harvest an undiminished volume of timber from subsale A. Rather, the real issue posed by the facts is whether, as a matter of contract law, such a right could be said to have survived the altered

6. As noted at the outset, the facts stated in the opinion are taken largely from a comprehensive stipulation of facts filed by the parties and from additional findings of fact made by the hearing officer.

circumstances wrought by the Grave Creek Fire.[7]

■ After much deliberation on the question, the Review Panel is unanimous in its view that the aftermath of the Grave Creek Fire—the resulting need of the Government to promptly undertake a clear-cutting operation—introduced a change in circumstances so fundamental in character as to extinguish all preexisting contract rights and duties affected by that need. For us then Modification No. 5 represents a valid and enforceable contract modification irrespective of any shortcomings one might assign to the legal analysis on which it was grounded or to the circumstances surrounding its execution. All that matters is that Spalding cannot claim that it gave away that which it had a right to keep.

In support of this result, we begin by noting that contract liability is generally equated with strict liability, meaning that one who makes a promise is expected to keep it. Therefore, if all this case involved was a loss of identification of trees marked for cutting, there would be no occasion for deeming the affected part of the contract at an end. The loss of markings in subsale A would stand as no more than a case of temporary impossibility of performance— one that the Government, as promisor, would be obliged to remedy by re-marking. Restatement (Second) of Contracts § 261 comment d (1988) ("a party is expected to use reasonable efforts to surmount obstacles to performance ... and a performance is [impossible] only if it is so in spite of such efforts.").

Moreover, enforcement of the contract would remain the rule even if the original markings could not be reestablished with complete certainty. In that event, the concepts of good faith and fair dealing (the cornerstone duties of all contractual relationships) would require the Government to offer a substitute performance. Restatement (Second) of Contracts § 270 comment b ("if the obligor can render a reasonable substitute performance in place of the im-

practicable part, he must do so under his duty of good faith in performance").

Clearly, contract law favors enforcement of a bargain. What then leads to a contrary result here? Enforcement of a contract as originally drawn is the rule where, despite the occurrence of intervening events that render a performance more burdensome or less desirable than anticipated, the essential nature of the undertaking remains unaffected. Departures from what was expected are deemed part of the risks inherent in the promises exchanged. 18 Williston On Contracts § 1963 (3d ed. 1978). However, events not foreseen at the time of contracting may so fundamentally alter the nature of a bargain as to suggest that the risks associated with those events were not within the contemplation of the parties. In such situations the central inquiry is whether "the non-occurrence of these events was a 'basic assumption on which the contract was made.'" Restatement (Second) of Contracts ch. 11, introductory note. Where the answer is yes, that is, where the contract reasonably cannot be interpreted as allocating to either party the risks caused by an extraordinary event, then further performance is excused. To do otherwise is to hold the parties to a bargain they never made. As we shall shortly explain, the situation we encounter here comes within this rule.

■ To put the matter into perspective, we note that discharge of performance based on an emergence of risks not foreseen at the time a contract was entered into is a principle of narrow application. Two categories of contract actions make up the class to which the rule is applied: (i) cases of impracticability of performance— those in which unanticipated intervening events have made the promised performance impossible to achieve or achievable only upon an exorbitant expenditure of resources, Restatement (Second) of Contracts §§ 261–264, and (ii) cases of frustration of purpose—those in which unanticipated in-

---

7. The Review Panel's concern with this issue was made known to the parties well in advance of the oral argument thus enabling them to

develop informed positions on the issue for presentation during the argument.

tervening events have so impaired the purpose of the contract as to destroy the value of the promised performance, Restatement (Second) of Contracts § 265. Ours is a case of frustration of purpose.

The rule respecting discharge based on frustration of purpose is set forth in section 265 of the Restatement (Second) of Contracts. It reads as follows:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

This case fits the rule. The Jamison–Harris contract was let on the premise that the selective cutting of the trees would further BLM's statutory responsibilities to manage the forests under its jurisdiction "in conformity with the principle of sustained yield for the purpose of providing a permanent source of timber supply." 43 U.S.C. § 1181a (1988). Selective cutting represented the implementation of a silviculture plan in which the trees not marked for harvest (roughly two-thirds of the forest area placed under contract) were to furnish the seed and the shelter for new growth. No less important, of course, was the intention to provide an economic return to the Government measured by the market value of the trees being sold. Thus, in its capacity as a contracting party, BLM was discharging a dual role—that of manager of the forest sustaining the forest's value for future generations, and marketer of the forest's resources assuring a return on those resources for the public. It is in the combination of these two elements that we see the reason for the Jamison–Harris con-

tract and hence also the Government's purpose in making the contract.

Neither of these objectives remained realizable after the fire. Selective cutting of the fire-affected timber in subsale A would have been a pointless exercise given that the area's capacity for self-regeneration had been greatly impaired by the extensive fire damage that occurred. Equally certain is that a resumption of contract activities in the fire-affected portion of subsale A would not have profited BLM because any immediate gain realized from Spalding's cutting activities could be expected to be offset by delay-caused decreases in the value of the fire-damaged non-contract timber. (As noted earlier, none of the proposed contract solutions to the after-fire circumstances, other than Modification No. 5, could have been put into effect without some expectation of a delay to the timely harvesting of the fire-damaged trees.) Plainly, continuation of the original contract in the fire-affected portions of subsale A would have made little sense. The objectives of the Government in making the bargain were completely frustrated.

■ The question that remains is whether the frustration of the contract was the result of an event whose non-occurrence was a basic assumption on which the contract was made. The answer is yes: the event was the near destruction of the forest by the Grave Creek Fire—an occurrence which the resource area manager summed up well in these words: "We had a disaster." Granted, there was a clause in the contract that dealt with fire (Section 7—"Passage of Title and Risk of Loss") but this provision focused only on loss of timber "sold under this contract." The clause did not address non-contract timber and, what is most important here, the impairment of that timber's regenerative capacity.[8] Of course, a convincing case could

---

**8.** According to the testimony of BLM's Assistant Regional Solicitor for the Pacific Northwest Lands and Minerals Division, incorporation of Section 7 in the Agency's timber sale contracts dates back to 1972. This testimony also points out that that contract clause was drafted by BLM in collaboration with representatives of the regional timber industry.

The clause reads in its entirety as follows:

*Passage of Title and Risk of Loss*—Title to timber sold under this contract shall remain in Government and shall not pass to Purchaser until such timber has been paid for and removed from the contract area. Unless cut timber is sold under this contract, risk of loss shall be borne by Purchaser after the timber is cut; *Provided, however,* that if loss results from a fire which was not caused by Purchas-

be made that the risks of such impairment should have been addressed in the contract for they were no less predictable than the risk of fire itself. However, that is not now our concern. The question we answer here is not whether the destruction of the forest's regenerative capacity should have been considered at the time of contracting but, rather, whether it was considered. There is nothing in the contract nor in the parties' dealings to suggest that the parties ever presumed more than a continuance of the conditions necessary to give purpose to a selective cut contract. In short, the contract did not address the conditions that arose; hence, further performance under the contract is excused.

■ Moving on, we turn next to the question whether Spalding's demand may be recognized as an equitable claim. In congressional reference actions decided by our predecessor institution, the United States Court of Claims, the view was occasionally expressed that an equitable claim was one that rested on considerations of moral responsibility—"what the Government ought to do as a matter of good conscience." *B. Amusement Co. v. United States*, 148 Ct.Cl. 337, 342, 180 F.Supp. 386, 390 (1960); *Burkhardt v. United States*, 113 Ct.Cl. 658, 667, 84 F.Supp. 553, 559 (1949). That view no longer finds favor. The rule now uniformly applied is stated in *California Canners & Growers Ass'n v. United States*, 9 Cl.Ct. 774, 785 (1986) " 'An equitable claim on a Congressional reference must rest on some unjustified governmental act that caused damage to the claimants. Absent a finding of negligence [or wrongdoing] on the part of gov-

ernmental employees, any award ... would be a gratuity' " (quoting *Wong v. United States*, Cong.Ref. No. 3–74, slip op. at 12–13 (Ct.Cl. Nov. 23, 1977)). Expressed in more concrete terms, what we are talking about are situations in which a claimant, though injured by Government action, either has no remedy under existing law or the remedy has become barred because of a statute of limitations. This, then, is the equitable claim standard that we adhere to.

Assessed against this standard, Spalding's situation does not offer a basis for equitable relief. This holds true even if we accept as correct the hearing officer's conclusions that BLM based Modification No. 5 on an erroneous interpretation of Section 7 (the contract's risk of loss provision)[9] and then compounded that error by obtaining Spalding's endorsement of the modification through an implicit threat of an even larger volume cutback.

■ To explain: as the prior discussion points out, a contractual right to harvest timber in the burned-over sections of subsale A did not survive the Grave Creek Fire; hence, there was no legal right in Spalding which the Government's "wrongful" actions could be said to have transgressed. Essentially this same reasoning also determines whether plaintiff may now find relief under the alternative heading of an equitable claim. The answer is again no because even as the Government's "faults" invaded no legal right of the plaintiff, so neither did they occasion any injury in their own right. The harm that Spalding suffered—the extinguishment of a contract expectancy—traces to an act of private wrongdoing and not to Government wrong-

---

er, his contractors, subcontractors, or the employees of any of them, the risk of loss shall be borne by the party holding title. If cut timber is sold under this contract, risk of loss shall be borne by the party holding title. Risk of loss to Government shall not exceed the value of such timber computed at the prices per unit for the species involved as set forth in *Exhibit B*. Nothing herein shall be construed to relieve either party from liability for any breach of contract or any wrongful or negligent act. As used in this section, the term *cut timber* refers only to timber which has been felled, bucked, or otherwise severed

by direct human activity prior to the date this contract was entered into.

9. As BLM construed it, Section 7 extended to all losses experienced on Government-owned timber, including even a loss of markings on the trees committed to harvest. The hearing officer rejected this reading. He ruled that Section 7 only addressed permanent losses, *i.e.*, destruction of the marked trees or significant impairment of their market value. Accordingly, the hearing officer concluded that, in a situation where fire-damaged trees retained their merchantability, a contract modification premised on Section 7 was contractually impermissible.

doing. In short, there was no fault on the Government's part of the sort for which relief in the name of equity would be appropriate.

### CONCLUSION

For the reasons stated, the Review Panel recommends that the Chief Judge advise the Senate that plaintiff, Spalding & Son, Incorporated, does not have a legal or equitable claim against the United States and that any award would be a gratuity.[10]

MEROW, Judge, concurring.

In addition to subscribing fully to the Review Panel's opinion, I write separately to question plaintiff's pursuit of relief by means of the congressional reference process. Throughout the course of this litigation plaintiff had available to it the opportunity to pursue relief under the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 601–613 (1988). And, on the theories on which this case was presented to the hearing officer, that available remedy was fully adequate to provide the relief requested. For example, if duress were present, Modification No. 5 could have been ruled invalid. *See Aircraft Assoc. & Mfg. Co. v. United States,* 174 Ct.Cl. 886, 357 F.2d 373 (1966).

Absent a good reason, congressional reference should not be sanctioned as an alternative to the comprehensive CDA procedure which Congress has mandated for most government contract disputes. Congress has traditionally required that available administrative and legal remedies be exhausted before congressional reference action is undertaken. Glosser, *Congressional Reference Cases in the United States Court of Claims: A Historical and Current Perspective,* 25 Am.U.L.Rev., 595, 613 (1976). Had Spalding promptly assert-

ed its claim under the CDA, as contractors are expected to do, the answer regarding contract rights now reached by the Review Panel would have occurred at a much earlier date and with far less time and expense for all concerned. It is doubtful that any congressional reference would then have followed but, if so, Congress would at least have had the benefit of a ruling on Spalding's claim under the CDA before making its decision whether to initiate the reference procedure.

Thus, Spalding's failure to exhaust its CDA remedy has unduly prolonged this controversy to the detriment of all concerned and constitutes a further reason to recommend that congressional relief be denied.

ANDEWELT, Judge, concurring.

As explained in the report of the review panel, this court no longer interprets the term "equitable claim" in 28 U.S.C. § 2509 as synonymous with "moral claim" and will recognize an equitable claim only upon a demonstration of "some unjustified governmental action that caused damage to the claimants." *California Canners & Growers Ass'n v. United States,* 9 Cl.Ct. 774, 785 (1986), (*quoting Wong v. United States,* Cong.Ref. No. 3–74, slip op. at 12–13 (Ct.Cl. Nov. 23, 1977)). Herein, for the reasons articulated in the Review Panel's report, the government did not engage in any such unjustified action and, hence, no "equitable claim" exists. However, even if Congress decides to take a different approach and to base its legislative decision on broader notions of equity, the facts as developed before the hearing officer still would not support enactment of a private bill.

---

**10.** Because our approach to this case has been fundamentally different from the approach taken by the hearing officer, we have not found it necessary to address many of the factual and legal conclusions set forth in his report which the defendant has challenged in this appeal. Accordingly, the absence of comment should not be taken as expressing any implied agreement with those conclusions. Nor, for that matter, should we be understood as subscribing to the hearing officer's adverse comments regard-

ing the credibility of the Government's witnesses. Our own review of the record suggests that the paucity of detail in some of the Government's testimony that troubled the hearing officer was the product of an understandable forgetting of old events rather than a shroud drawn over the truth. The acknowledged excellent working relationship that existed between Spalding and the BLM prior to the Grave Creek Fire would tend to confirm this view.

The essence of plaintiff's contention that the government treated plaintiff inequitably is that the Bureau of Land Management (BLM) agreed to sell certain trees to plaintiff at one price, reneged on that agreement, and then proceeded to sell the very same trees to another purchaser at a higher price. Plaintiff argues that when it agreed to purchase the timber at a specified contract price, plaintiff not only assumed the risk that the timber would decline in value during the time period before the timber could be cut, but also reserved for itself any resulting profit if, as here, the timber increased in value during that period.

When viewed this narrowly, plaintiff's equitable argument has considerable appeal. However, because plaintiff asks Congress to appropriate taxpayer money to redress alleged inequitable treatment by the BLM, it would seem appropriate to take a somewhat broader look at the historical relationship between plaintiff and the BLM. Specifically, it is appropriate to consider Congress's adoption in the fall of 1984 of the Federal Timber Contract Payment Modification Act (FTCPMA), 16 U.S.C. § 618.

In the early 1980's, plaintiff and many other timber companies in the western states were in a precarious financial position. These companies had entered into contracts with the federal government to purchase timber at specified prices, but, between the time of contracting and the time of cutting, the value of the timber dropped precipitously. Under the terms of their respective contracts, the timber companies bore the risk of such a drop in price and the government had the right to insist on contract performance. But Congress prevented the BLM from insisting on contract performance by enacting the FTCPMA, which permitted timber companies to "buy out" their government contracts under highly favorable conditions.

Herein, the parties stipulated that had the FTCPMA not been enacted, plaintiff would have lost $11,217,796 on nine then-existing government timber contracts, a sum in excess of 50% of plaintiff's net worth. Instead, taking advantage of the provisions of the FTCPMA, plaintiff requested and received termination of these contracts in exchange for a payment of $644,272. The government thereafter was faced with the necessity of reselling the previously sold timber, but at a lower price than plaintiff previously had agreed to pay. Thus, within six years after the 1978 Grave Creek Fire, plaintiff was saved from financial losses in excess of $10.5 million by the good graces of Congress and the financial sacrifice of the American taxpayer.

Plaintiff contends, in effect, that the two incidents are not related. Plaintiff argues that it would have received the $10.5 million bail-out even if the government had treated it equitably on the Jamison–Harris sale and, hence, the FTCPMA bail-out should not prevent plaintiff from receiving the $194,832.25 in damages that the hearing officer calculated with respect to the Jamison–Harris sale. But contrary to plaintiff's contentions, the two incidents are closely related. In both cases, prior to cutting, the price of the timber moved in an amount and direction apparently not foreseen by the parties when they entered the timber contracts. In one instance, prices moved unexpectedly up and in the other unexpectedly down. The fact that Congress bailed out plaintiff when the price of timber went down would seem highly relevant when assessing whether it would be "moral" or "equitable" to mandate the government also to make payments, not legally owed to plaintiff, when the price of timber went up. *See Oregon Forest Fire Ass'n v. United States*, 170 Ct.Cl. 308, 316 n. 7, 321 (1965). In a variation of the theme "heads I win/tails you lose," plaintiff argues that although it won when the price of timber went down, it should also win when the price of timber went up. It would not seem that traditional notions of equity would support such a result.

Thus, when all of the pertinent facts are considered, the United States owes no moral or equitable debt to plaintiff. To the contrary, given the disparity in value be-

tween the contract rights the government relinquished in plaintiff's favor in the FTCPMA and the contract gain the government achieved here, on balance, it would appear that plaintiff has been treated most generously by both the United States government and the United States taxpayer.