Donald W. SNEEDEN, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Cong. Ref. No. 92–865 X.

United States Court of Federal Claims.

Aug. 11, 1994.

Sneeden, Mary S. Sneeden, and Henry Best, stockholders and officers of Lincoln Construction Company, Inc. (Lincoln).[1] Under 28 U.S.C. § 2509, either House of Congress may refer such a bill to the Chief Judge of this Court for a report. The Chief Judge designates a hearing officer to conduct findings of fact in accordance with our rules and practice. A three-judge panel of this court reviews the hearing officer's findings.

In accordance with 28 U.S.C. § 2509 this court must determine the facts bearing upon the question presented by Congress. We inform Congress whether the demand is a legal or equitable claim, or a gratuity, and the amount due the claimant, if any.[2] Then Congress acts on the bill referred or passes a substitute bill.

The substance of the hearing officer's report is advisory and conclusions whether the claim is legal or equitable, and compensation due, are recommendations only. The facts of each case are *sui generis;* congressional reference cases have no binding value as precedent.

The bill referring this case to the Court of Federal Claims asked only one question related to the merits: Did the United States act in bad faith in settling plaintiffs' claim before the Board of Contract Appeals. A careful review of the record of this trial does not support a finding of bad faith by the Government, as that term is generally accepted by the legal community. For that reason alone, we find that an award to Lincoln would be a gratuity.

John L. Napier, Washington, DC, for plaintiffs.

Franklin E. White, Jr., U.S. Dept. of Justice, Washington, DC, for defendant.

REPORT OF THE HEARING OFFICER

HODGES, Judge.

This congressional reference arises from a private relief bill to compensate Donald W.

I

On February 14, 1978 the United States Army Corps of Engineers awarded Contract No. DAWC 54–78–C–0020 to J. Lawson Jones Construction Company, Inc. (Jones) as the prime contractor on the Wilkerson Creek Bridge Replacement Project in Hyde County, North Carolina. The contract contemplated replacing an existing bridge over the Atlantic Intracoastal Waterway with a new bridge. Construction for the roadways form-

---

1. H.R. 6012, 102d Cong., 2d Sess. (1992).

2. RCFC Appendix D.

ing the approaches to the bridge required over 325,000 cubic yards of earth embankments. The contract completion date was February 27, 1980. Lincoln began work in March 1978 as a subcontractor.

Lincoln's responsibility was to construct the earthen embankment approach to the bridge. The government's project was based upon a design by the North Carolina Department of Transportation. The original design had provided for embankments no higher than 30 feet. The Government altered this design in response to a value engineering proposal.[3] The value engineering program changes raised the embankment to 45 feet, shortened the concrete portion of the bridge, and increased the earthwork to a 52-foot fill. Lincoln learned of the changes only after filing a Freedom of Information Act request.

Lincoln experienced difficulty performing under the changed specifications because of moisture conditions of the soil. Following several unsuccessful attempts to resolve the moisture problems caused by the changed specifications, the Corps blamed plaintiffs and directed that Lincoln remove its quality control officer.

Lincoln hired Dr. Ralph Fadum, Dean of Engineering at North Carolina State University, a recognized soils expert. He concluded that the contract could not be performed because of defective specifications and composition of the soil.

Following meetings with Senator Robert Morgan's staff and Corps personnel, Lincoln requested a final decision from the Contracting Officer on its claim. The Contracting Officer denied Lincoln's claim on November 5, 1979.

In January 1980, Congressman Charlie Rose offered his assistance and arranged a meeting among Corps personnel, Mr. Sneeden, and two presidential assistants. At this meeting, the Corps' Deputy Director for Civil Works recommended that Lincoln appeal the CO's decision to the division engineer in Atlanta. That meeting did not resolve the dispute, and Lincoln took its case to the Corps

of Engineers Board of Contract Appeals in December 1980. The Board did not issue an opinion for five years. The trial lasted seven weeks. Lead counsel for the Corps was Mr. Alva Hall.

The Wilkerson Bridge project was completed in September 1981, eight months after the trial and three and one-half years after Lincoln commenced performance. After months of no decision from the Board, Lincoln's financial situation deteriorated to the point that Lincoln's surety no longer would support Lincoln. Lincoln was unable to secure other contracts because it could not be bonded. Lincoln filed for bankruptcy in 1982; its principal asset was its claim against the Government.

Two years after trial, still with no Board opinion, Lincoln's counsel requested a predecisional audit, and the Corps agreed. The 1983 audit concluded that Lincoln's claim totaled $2,572,028. However, the parties were unable to agree on the audit and the Corps would not negotiate cost figures. The audit was used to furnish information to the Contracting Officer concerning the claims. The accountant in charge of the 1983 audit noted in his memo on the audit report that the results were intended for evaluation of the claimed costs, and not for any other use. This audit was revised during the quantum negotiations three years later. In January 1986, five years after trial, the Board ruled for Lincoln on all counts and directed the parties to settle the quantum by negotiation. The Corps sought reconsideration of the Board's decision, and this motion was denied in June 1986. Five and a half years after trial began, the Board closed the liability phase of plaintiffs' claim.

The Corps designated Mr. Hall to negotiate the quantum issue. Mr. Hall considered the Board's decision to have been wrongly decided, and he wanted to try the quantum portion of Lincoln's claim before the Board. He believed that the Government had defenses to the quantum issue, and this belief determined his beginning point for the quantum negotiations.

---

**3.** The value engineering program encourages contractors to suggest methods of performing contracts more economically, without impairing essential characteristics or functions. Contractors are rewarded for these cost-saving suggestions.

## II

The first issue for negotiation was the amount of interest applicable to Lincoln's claim. The Government's internal documents supported an interest rate of 79.98%, but the rate negotiated at the first meeting in February 1986 was 70%. Plaintiffs contend that this was evidence of the government's bad faith.

The Contracting Officer was required to act impartially in negotiating quantum, but the rights of both parties must be considered. The 79.98% interest rate was based on a standard index rate from November 1979 to February 1986. Some claimed costs were incurred after November 30, and the Corps was not permitted to pay interest on claims not yet incurred. The original calculation of 79.98% did not reflect the amount to which plaintiffs were entitled, as the government argued in their negotiations. Plaintiffs now state that they did not agree to the 70% interest rate.

Plaintiffs were represented by well-informed attorneys who were experienced negotiators. Plaintiffs could not show that they accepted a 70% interest rate involuntarily. They argue that the Government had authority to settle at an 80% rate, and thus the 70% rate was an act of bad faith, but plaintiffs were not under duress to accept the 70% interest rate. For three months, plaintiffs did not attempt to renegotiate the government's 70% interest rate calculation, despite their own 85% calculation. By their silence, plaintiffs accepted the 70% interest rate calculation.

Plaintiffs testified that Mr. Hall's $1,027,750 [4] opening was such a "low-ball offer" that their attorneys were offended. Mr. Hall testified that the offer he made was a starting point, and he knew that plaintiffs' attorneys would not accept it. As noted previously, Mr. Hall based his calculations on his theory that the government had certain quantum defenses. The offer was low, but alone it does not constitute bad faith. Plaintiffs countered with an unreasonably high figure of $8 million.

During a conversation with one of plaintiffs' attorneys, Mr. Hall responded with a $3.5 million offer, good for 24 hours. Plaintiffs argued at trial that this 24–hour deadline was so unreasonable as to evince bad faith. However, plaintiffs asked for more time to discuss the offer with the surety, and they got it. Defendant offered 30 or 60 days, and plaintiffs accepted 30. If the original 24–hour time constraint were restrictive or coercive, the subsequent extension neutralized such impropriety.

Plaintiffs contend that the audit reports, viewed in a light most favorable to the Government, show that plaintiffs were entitled to at least $2.5 million in damages. Although Mr. Hall did not agree with the original audit, the final negotiated settlement was $4.3 million. Plaintiffs thought that the posture taken by Mr. Hall during the original negotiations was an effort to avenge plaintiffs' victory at trial. If plaintiffs' view that the audit reports justify at least $2.5 million are correct, the final settlement of $4.3 million seems reasonable irrespective of Mr. Hall's attitude. According to defendant, the original "low-ball offer" was based on an audit report supporting a $2.5 million claim, minus Mr. Hall's view of possible defenses had the quantum issue gone to trial.

Although Mr. Hall was not removed from the negotiation team, he did not attend subsequent meetings. Even so, plaintiffs allege that the Government's negotiating team was "tainted" by Mr. Hall's continuing malice toward plaintiffs and his disappointment over losing the case. We found no evidence to support this notion.

The parties agree that Colonel Hanson, the Contracting Officer assigned to the quantum negotiation, was sympathetic to plaintiffs. He negotiated an additional $800,000 for plaintiffs at a later meeting, bringing the total settlement to $4.3 million. Colonel Hanson testified that he returned to Washington after the agreement to assure payment of the $4.3 million within sixty days. He stated that the $4.3 million figure was fair, based on his analysis of the major issues.

---

**4.** Testimony concerning the initial offer was conflicting because it was unclear whether the offer included interest. The offer was either $1 million or $1.2 million.

Colonel Hanson advised Mr. Sneeden to accept the offer because he was transferring to Alaska and the new district engineer would be unfamiliar with Lincoln's case. This would delay the relief needed by Lincoln. This testimony suggested to this court that Colonel Hanson wished to expedite the settlement to help Mr. Sneeden, not to force him into a decision as plaintiffs seemed to believe during trial.

The Contracting Officer's responsibility was to assure plaintiffs equitable relief. Colonel Hanson was a credible witness who is highly regarded by both sides. On cross-examination, he testified convincingly that no effort was made to force Mr. Sneeden to reject or accept the settlement proposal. No testimony during trial suggested that Colonel Hanson acted unfairly. He did advise Mr. Sneeden of what might happen if a settlement were not reached, but this was consistent with his responsibility as Contracting Officer. Colonel Hanson also stated that the Corps was not pressuring him to push for settlement; the decision was Mr. Sneeden's. Mr. Sneeden's bankruptcy lawyers advised him that no reasonable alternative to accepting the award was available.

Plaintiffs contend that defendant's unfavorable treatment throughout the contract period caused Lincoln's bankruptcy. We found evidence that some money was transferred from Lincoln Construction Company to Lincoln Development Company during the contract period. We heard testimony during trial that Mr. Sneeden received over $250,000 in accrued salary from Lincoln Construction Company. Some of the damages claimed by plaintiffs at trial were ordinary taxes from years prior to the contract. Such findings raise the possibility that other factors may have contributed to Lincoln's demise.

### III

Defendant argued repeatedly pre-trial that we should not hear this case because government employees are entitled to a presumption of good faith. In our view, the well-known presumption of good faith enjoyed by government employees was unimportant in this case because the very issue Congress asked us to address was whether government employees acted in bad faith. Every human being is entitled to a level of respect from any finder of fact, such that one begins with the hope that most people—government employees or not—are motivated by proper intentions. But we did not view any special presumption as a legal issue in this case, and it turned out not to be factually important either.

Cases sent to this court by congressional reference are reviewed both for valid legal claims and for equitable considerations. An equitable claim, however, does not necessarily mean that we may recommend judgment on the basis that it would be the right thing to do. That is, we may not rule for a party solely because we feel that he or she is entitled to judgment as a matter of conscience. *See, e.g., Spalding & Son, Inc. v. United States,* 28 Fed.Cl. 242 (1993). Instead, "what we are talking about are situations in which a claimant, though injured by Government action, either has no remedy under existing law or the remedy has become barred because of a statute of limitations." *Spalding,* 28 Fed.Cl. at 250.

"'An equitable claim in a Congressional reference must rest on some unjustified governmental act that caused damage to the claimants. Absent a finding of negligence [or wrong doing] on the part of governmental employees, any award herein would be a gratuity.'" *Shane v. United States,* 3 Cl.Ct. 294, 304 (1983) (quoting *Wong v. United States,* Cong.Ref. No. 3–74, slip op. at 12–13 (Ct.Cl. November 23, 1977). Therefore, plaintiffs must show: (1) that defendant committed a negligent or wrongful act; and (2) that this act caused damage to the plaintiffs. *California Canners & Growers Ass'n v. United States,* 9 Cl.Ct. 774, 785 (1986).

One issue to be considered in whether to remove a legal bar to recovery is whether the claimant had options available to him that would have avoided the need for extraordinary relief. Congress made the following comment in relation to the bill before us: "A private bill is required because the claim otherwise would be barred by the settlement agreement, which said the Government was

released from all claims arising out of the contract dispute and that the agreement constituted a full accord and satisfaction of all the contractor's claims against the United States." H.R.Rep. No. 1004, 102d Cong., 2d Sess., at 2 (1992).

■ Defendant argued that Mr. Sneeden had remedies available to him at the time of the settlement agreement, if he thought that it was unfair or coercive. For example, he could have appealed his settlement to the Board. Mr. Sneeden was having financial difficulties at the time of the settlement agreement, however, and an appeal to the Board would have caused more delays that he reasonably believed would have ruined him financially. Mr. Sneeden had no money to cover the legal expenses needed for an informed appeal. While defendant pointed out that he could have proceeded pro se, this was not a reasonable option in the circumstances of this case. A person entering this case pro se at so late a point would have been lost in a web of legal and factual issues.

The five-year delay in obtaining a judgment from the Board caused serious financial difficulties for plaintiffs. Lincoln Construction Company could not secure new contracts because it could not be bonded. Another delay would have postponed delivery of money owed them by the Government. Plaintiffs were involved in bankruptcy proceedings, and the money was needed then.

We determined that plaintiffs should be permitted to show that they were entitled to equitable relief. Our duty is to inform Congress of reasons why a bar to relief should or should not be removed. The ultimate decision on the merits is for Congress alone.

### IV

■ The House Resolution directs this court to "determine whether the United States acted in bad faith in settling the claim, knowing that at the time of the settlement negotiations Lincoln Construction Company, Inc., because of its obligation to pay debts pursuant to a bankruptcy proceeding, was constrained to accept even an unreasonable settlement offer." Thus, we focused trial on the issue of whether the United States gov-

ernment used its superior legal and financial resources to coerce a weak but successful litigant into an unfair settlement of its claim.

Bad faith is defined by Black's Law Dictionary as "not simply bad judgment or negligence, but rather ... the conscious doing of a wrong because of dishonest purpose or moral obliquity...." Black's Law Dictionary 139 (6th ed. 1990). Plaintiffs made no showing that anyone acting on behalf of the United States did so maliciously or with a "design to defraud."

After the Board's decision, defendant's obligation was to ensure that plaintiffs received the fair value of their claim. The testimony of Colonel Hanson demonstrates that this obligation was fulfilled.

### V

Mr. Sneeden impressed us as an honest, hardworking businessman who experienced serious financial reversals which may not have been entirely his fault. In some respects, he was treated harshly by his Government. For example, we have no explanation of why it took five years for the Board to award plaintiffs judgment on all counts, then direct the Contracting Officer to negotiate a settlement on quantum. By then, his financial position was tenuous at best; an appeal by the Government on quantum would have been ruinous.

Irrespective of Mr. Sneeden's other problems, he had effective counsel before this court. We are satisfied that every element of the negotiations that may have hinted of bad faith was brought to the court's attention. However, bad faith was not present in the negotiations, as that term is defined in our jurisprudence.

Plaintiffs' best hope of proving bad faith was the attitude of Mr. Alva Hall during negotiations. We determined during trial that this was mostly a personality clash that Colonel Hanson was able to resolve. Giving plaintiffs every benefit of the doubt, as we wish to do in this equitable proceeding directed by Congress, still we cannot find evidence of bad faith.

CONCLUSION

We can make no finding of bad faith on the part of the Government in its settlement negotiations with Lincoln. This was the sole question asked of us by Congress. Using that standard, relief granted to Mr. Sneeden would be a gratuity.

The final negotiated settlement was $4.3 million. This was a fair offer that plaintiffs accepted, and we find that the Contracting Officer acted in the capacity that was required of him. After the $3.5 million offer was made, Colonel Hanson added $800,000 and entered a clause in the settlement agreement to ensure that plaintiffs would receive the settlement within sixty days because he knew that plaintiffs needed the money as soon as possible.

Mr. Hall was disappointed about losing the liability trial, and his demeanor on the stand supports an inference that he may have been bitter at the time of negotiation. His personality did not facilitate the negotiation process, vis-a-vis plaintiffs' approach to negotiation. We cannot find that his bitterness affected the quantum negotiations, however. Colonel Hanson was in charge of the quantum negotiation, and he testified that the settlement offer was fair. Even at trial, plaintiffs had confidence in Colonel Hanson. We agree both with that assessment and with his determination of fairness.

Accordingly, we find (1) that the Government did not act in bad faith in the negotiation process; (2) that the settlement of plaintiffs' claim was not unfair or coercive; and (3) that an additional award to plaintiffs would be a gratuity. Congress should be so advised by the Chief Judge of this court.