**ESTATE OF Dr. Beatrice BRAUDE, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 93–645X.**

United States Court of Federal Claims.

March 7, 1996.

Christopher N. Sipes, Washington, D.C., for plaintiff. S. William Livingston, Jr., of counsel.

Lisa B. Donis, with whom were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director, Washington, D.C., for defendant.

## OPINION

ANDEWELT, Judge.

### I.

This congressional reference action harks back to a dark era in American history when Senator Joseph R. McCarthy was a powerful political force in this nation, when promising careers in the public and private sectors were arbitrarily cut short based on innuendo, unsubstantiated allegations, and irrational fears, and when blacklists prevented loyal American citizens from securing employment in jobs for which they were well qualified. Plaintiff, the Estate of Dr. Beatrice Braude, contends that Dr. Braude was a victim of this era.[1] In its complaint, plaintiff alleges that Dr. Braude's career with the United States Information Agency (USIA) was arbitrarily and illegally cut short in 1953 as a result of

---

**1.** In its post-trial brief, defendant describes the "McCarthy Era" as follows:

There is no doubt that, during the years that have become known as the "McCarthy Era," there were individuals, both Government employees and otherwise, who were wrongfully accused and labelled by individuals in the Government as "communists" or "communist sympathizers." The lives and careers of some of these people were irrevocably damaged, and there was, and is, simply no excuse for the wrongs that were visited upon them. As a result, we must be ever vigilant to ensure that the Government never engages in this type of behavior again.

baseless concerns about Dr. Braude's loyalty to the United States, and that after her termination by the USIA, Dr. Braude was blacklisted for a period of time and prevented from securing government employment. In 1977, Dr. Braude filed suit in the United States Court of Claims attacking her 1953 termination and seeking reinstatement to her USIA position with attendant back pay. The court dismissed Dr. Braude's action on statute of limitations grounds and did not address the merits of her claim. *Braude v. United States*, 218 Ct.Cl. 270, 278, 585 F.2d 1049, 1054 (1978). In 1982, almost 30 years after she was terminated from the USIA, the Central Intelligence Agency (CIA) hired Dr. Braude as a language instructor. Dr. Braude died in 1988.

In 1993, Senators Daniel P. Moynihan and Alfonse M. D'Amato jointly introduced a private bill, S. 840, in the United States Senate for the relief of the estate of Dr. Braude with respect to any claim for back pay arising out of her 1953 termination. The Senate transmitted that bill to this court for consideration as a congressional reference action under 28 U.S.C. §§ 1492 and 2509. S.Res. 102, 103d Cong., 1st Sess. (1993). Section 2509(c) obliges this court to determine the facts underlying a referred claim and then "inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant."

Plaintiff thereafter filed a three-count complaint in this court. Count I alleges that the USIA based Dr. Braude's 1953 termination on questions concerning her loyalty to the United States and that the termination violated applicable statutes and regulations and Dr. Braude's constitutional right to due process.[2] Count II alleges, in effect, that after terminating Dr. Braude in 1953, defendant blacklisted Dr. Braude and denied her feder-

al employment. Count III alleges that defendant fraudulently concealed from Dr. Braude the true reasons for her dismissal and deprived her of adequate notice and an opportunity to clear her name.[3] This court held trial on plaintiff's claims in November 1995, 42 years after the USIA terminated Dr. Braude's employment. In Sections II–IV below, the court sets forth its factual determinations. For the reasons explained therein, the court finds that the USIA (1) selected Dr. Braude for termination in 1953 based on questions about her loyalty to the United States, (2) intentionally concealed from Dr. Braude the true reasons for her termination, and (3) blacklisted Dr. Braude for a period of time after her termination. In Sections V–X, the court analyzes whether, based on these findings, plaintiff has presented "a legal or equitable claim or a gratuity." For the reasons set forth therein, the court concludes that the USIA's blacklisting of Dr. Braude constitutes an equitable claim for which compensation is equitably due.

## II.

On December 31, 1953, after ten years of employment with the United States government and only one day after being praised for her work and being told she would receive a pay increase, Dr. Braude was informed that her employment with the USIA was being terminated for budgetary reasons pursuant to Public Law No. 207 (P.L. 207).[4] Congress had allocated less money to the USIA than the President had requested and the allocated funding required termination of at least some USIA employees. P.L. 207 gave the Director of the USIA the discretion to select which employees to terminate in response to the reduced budget. Unknown to Dr. Braude at the time of her termination, the reason the USIA selected her from among the numerous USIA employees for

---

2. Count I also alleges that the termination violated other constitutional rights. In its post-trial presentation of its arguments, however, plaintiff abandoned these other constitutional arguments and now alleges exclusively a violation of procedural due process.

3. Defendant moved to dismiss Counts II and III of the complaint on the ground that these claims do not fall within the scope of this congressional

reference. In a prior order, this court denied defendant's motion based on the court's conclusion that these claims fairly can be said to arise out of Dr. Braude's termination and thus this congressional reference reaches these claims.

4. Supplemental Appropriation Act of 1954, Pub.L. No. 83–207, ch. 340, 67 Stat. 418, 421 (1953).

termination was because of concerns about her loyalty and security risk to the United States. In an internal memorandum dated January 12, 1954, USIA officials listed eight questions or criteria that the USIA had used in selecting employees for termination and stated: "Affirmative answers to any, part, or all of the foregoing questions concerning any eligible employee was considered sufficient reason to consider [that employee] for termination." Criterion number 5 stated: "Did [the employee's] past activities or associations suggest possible questions as to loyalty?" Apparently pursuant to this criterion, the USIA's Office of Security reviewed Dr. Braude's file and ultimately recommended in writing that the USIA terminate Dr. Braude's employment pursuant to P.L. 207 because of loyalty and security concerns. USIA officials, in turn, adopted that recommendation and terminated Dr. Braude's employment.

The USIA's Office of Security based its recommendation to terminate Dr. Braude's employment on information uncovered during a prior investigation of Dr. Braude by the State Department's Loyalty Security Board. That prior investigation, which had been completed approximately two years earlier, had ended with a complete exoneration of Dr. Braude. The investigation focused mainly on Dr. Braude's contacts with two individuals, her brief membership in an organization known as the Washington Bookshop in Washington, D.C., and her past membership with certain trade unions. During the course of the investigation, Dr. Braude provided detailed answers to written interrogatories from the Loyalty Security Board. In those answers, Dr. Braude described her contacts with the two individuals, one who apparently was thought to be actively involved in the American Communist movement and the other who was a former Justice Department employee who had been convicted on two separate charges of spying. (The second individual's convictions were overturned on appeal.) Dr. Braude explained, in effect, that her contacts with these individuals were rare, casual, innocuous, and of a purely social rather than political nature. As to the Washington Bookshop, Dr. Braude explained that she had joined the bookshop for purely social

purposes—the bookshop sponsored musical events and Dr. Braude, who had recently moved to Washington, D.C., wanted to meet new friends. When Dr. Braude became concerned about participation in the bookshop by Communists, she let her membership lapse. As to the trade unions, Dr. Braude stated that she believed in trade unions and had opposed the influence of Communists within them. Dr. Braude described herself as a loyal citizen of the United States who was generally an apolitical person but who had become an "anti-Communist" based on her first-hand knowledge of the Communist terror while working for the State Department in Europe.

Dr. Braude understood the international threat to the security of the United States that existed at the time but asked that the Loyalty Security Board evaluate her based on her own character and beliefs and not those of individuals with whom she had come into casual contact. In her answers to the interrogatories, Dr. Braude explained:

> In view of the troubled international situation, I quite understand that the loyalty of the members of the State Department and the Foreign Service should be rigorously examined. But I cannot believe that one should be condemned for merely ephemeral past associations. Furthermore, all past activity must (at the risk of sounding like Alistair Cook) be viewed in the framework of the historical picture of that time. Any person living in New York during the Depression thirties, with any pretensions to intellectual aspirations, was bound to come into contact with persons with Communist sympathies....

After reviewing the evidence it had accumulated, on October 31, 1951, the Loyalty Security Board unanimously decided to close the investigation. In a February 11, 1952, letter to Dr. Braude, the Loyalty Security Board stated that "there is no reasonable doubt as to your loyalty to the United States Government or as to your security risk to the Department of State."

In stark contrast to the Loyalty Security Board's conclusion that the evidence left "no reasonable doubt" as to Dr. Braude's loyalty

and security risk, less than two years later, with knowledge of the State Department's prior action and based on the very same evidence that the State Department had considered,[5] the USIA's Office of Security recommended that Dr. Braude be terminated for loyalty and security reasons. USIA officials adopted that recommendation,[6] but determined not to reveal to Dr. Braude that they had selected her from among the many USIA employees for termination because of concerns about her loyalty and security risk to the United States.[7]

### III.

Prior to her 1953 termination, Dr. Braude had a successful career in the federal government. She was well thought of and consistently received high evaluations for her work. Dr. Braude received both her B.A. and M.A. in French by 1939 and began her federal career in 1943 as a stenographer and later as a researcher in the Office of Strategic Services in Washington, D.C. In 1945, she transferred to the State Department's European Research Division and was later reclassified to the Foreign Service Staff Corps and assigned to the United States Embassy in Paris as a research assistant. While in Paris, Dr. Braude attained the position of Assistant Cultural Affairs Officer. In May 1953, Dr. Braude was reassigned to Bonn, Germany, as an Exchange Officer, and on August 1, 1953, was transferred to the newly formed USIA. In early December 1953, upon her father's death, Dr. Braude returned to Washington, D.C., and was thereafter reassigned to the position of Foreign Service Staff Officer. The USIA terminated Dr. Braude less than one month later.

Dr. Braude considered her career with the federal government fulfilling, both intellectually and financially. After her termination in 1953, she made repeated and persistent efforts to re-secure a position with the federal government. Commencing in 1954, she applied for at least ten jobs at both the State Department and the USIA. For example, in 1956, she applied for the very job from which she was dismissed. Then, in 1957, she applied for a typist position at the USIA but, despite receiving a perfect score on the Civil Service typing exam and being rated as eligible for federal employment by the Civil Service Commission, the USIA did not offer her a position.

Over the years, in addition to applying for employment at the State Department and the USIA, Dr. Braude unsuccessfully sought employment at other federal agencies, including the Civil Aeronautics Board, the Departments of Commerce and Interior, the Department of Health, Education, and Welfare, and the United States delegation to the United Nations Educational, Scientific, and Cultural Organization. All of Dr. Braude's efforts were unsuccessful until 1982 when she secured the teaching position at the CIA. In the interim, Dr. Braude earned her Ph.D. and worked at a series of different jobs, including as a producer of a PBS series involving Eleanor Roosevelt and as a French instructor at the University of Massachusetts, where she rose to the position of tenured associate professor. Dr. Braude, however, did not consider these subsequent jobs as fulfilling as her former position at the USIA.

Over time, Dr. Braude became increasingly suspicious as to why, despite her excellent qualifications, she was unable to secure em-

---

**5.** The Office of Security apparently did not conduct a new investigation or consider any new evidence.

**6.** Defendant argues that other factors may have contributed to Dr. Braude's termination. For example, defendant notes that Dr. Braude had been transferred to the USIA's Washington, D.C., office less than one month before her termination and hence did not have an opportunity to demonstrate to her supervisors her value to the USIA. But the evidence presented at trial points directly to only one reason for Dr. Braude's selection for termination—loyalty and security concerns.

Consistent with criterion number 5 of the January 12, 1954, internal memorandum, the USIA's Office of Security recommended in writing that Dr. Braude be terminated for security reasons. Defendant has not presented any other recommendation for Dr. Braude's termination based on any of the other seven criteria listed in that memorandum.

**7.** The January 12, 1954, internal USIA memorandum explained: "The unit heads were cautioned not to get into 'specifics' as to the reasons why each employee was selected for termination."

ployment with the federal government. After enactment of the Privacy Act of 1974, 5 U.S.C. § 552a, Dr. Braude secured her government records which, as explained above, indicate that her termination was based on loyalty and security considerations. The disclosure of these documents led to Dr. Braude's unsuccessful 1977 suit seeking reinstatement and attendant back pay in the Court of Claims. The Court of Claims held that Dr. Braude's claim was barred by the statute of limitations because Dr. Braude should have been aware of the facts that formed the basis for her claim more than six years before she instituted suit. *Braude,* 218 Ct.Cl. at 278, 585 F.2d at 1054.

## IV.

At trial, plaintiff contended that Dr. Braude's inability to secure government employment between 1953 and 1982 was the result of her being blacklisted by government officials, *i.e.,* the result of USIA officials marking out Dr. Braude for special avoidance and intentionally and improperly interfering with her ability to secure future employment.[8] Defendant responded with possible alternative reasons for Dr. Braude's failure to secure government employment, including an allegedly unexceptional Civil Service exam grade in 1963, the desirable and hence competitive nature of many of the positions for which Dr. Braude applied, possible discrimination at the time against women of Dr. Braude's age, and Dr. Braude being possibly too forthright during some interviews about the details of her prior termination.

▮ It is not surprising, given the many years that have passed since Dr. Braude applied unsuccessfully for the various government positions, that neither party was able to present direct, clear, and unequivocal evidence as to the reasons why federal agencies repeatedly denied Dr. Braude's applications for employment. The witnesses who could have testified directly about what happened are either deceased or otherwise unavailable. The court therefore has been forced to piece together the pertinent facts, mostly from disparate documents which themselves are not without some ambiguity. As a result, the court cannot be certain as to precisely what happened regarding Dr. Braude between 1953 and 1982. The law, however, does not demand certainty. Instead, for a plaintiff to prevail in a civil action, the law requires only that the plaintiff prove the factual predicates that underlie its claim by a preponderance of the evidence, *i.e.,* with respect to each material fact, the plaintiff must demonstrate that the existence of that fact is more probable than the fact's nonexistence. *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 508 U.S. 602, 622, 113 S.Ct. 2264, 2279, 124 L.Ed.2d 539 (1993). Hence, this court must focus on the quality and quantity of the evidence presented and make a determination as to whether plaintiff has demonstrated that it is more likely than not that plaintiff's lack of success in securing federal employment was the result of her having been blacklisted. Upon review of all of the evidence submitted at trial, although this issue is fairly close, the court concludes that plaintiff has demonstrated by a preponderance of the evidence that Dr. Braude's inability to secure at least some of the federal positions for which she applied between the time of her termination in December 1953 and the mid–1960s was the result of her being blacklisted by USIA officials. The court bases

---

**8.** *Black's Law Dictionary* 170 (6th ed. 1990) defines "blacklist," in pertinent part, as follows: A list of persons marked out for special avoidance, antagonism, or enmity on the part of those who prepare the list or those among whom it is intended to circulate; as where a trades-union "blacklists" workmen who refuse to conform to its rules, or where a list of insolvent or untrustworthy persons is published by a commercial agency or mercantile association.
The Restatement (Second) of Torts § 766B (1977) states:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
(b) preventing the other from acquiring or continuing the prospective relation.

this conclusion on (1) the acknowledged use of blacklisting during the McCarthy era, (2) Dr. Braude being a potential candidate for such blacklisting because she was terminated for loyalty and security reasons, (3) Dr. Braude's excellent employment credentials, and (4) a series of suspect actions that indicate that USIA officials were undermining Dr. Braude's employment efforts.

First, in evaluating the evidence submitted and determining whether the USIA blacklisted Dr. Braude, the court must evaluate the USIA's actions in the context of the politically charged atmosphere of the time. For a period of years, Senator McCarthy and others who shared his ideological beliefs constituted a powerful and feared political force in the United States. These individuals engaged in a concerted and often successful effort directed against those whom they personally deemed either sympathetic to the goals of Communism or otherwise disloyal to the United States. As defendant openly acknowledges in its post-trial brief, one of the tools that these individuals used to further their goals was the employment blacklist. ("It is undisputed that there were many individuals who were blacklisted—that is, unable to pursue their livelihoods—during the McCarthy era.") See also supra note 1. Therefore, in assessing whether the USIA blacklisted Dr. Braude, it is necessary to recognize that blacklisting was a tactic used during at least a portion of the time Dr. Braude unsuccessfully sought federal employment. Similarly, it is necessary to appreciate that Dr. Braude was a potential target for such blacklisting because she had been terminated from the USIA as a result of loyalty and security concerns.

Next, Dr. Braude's excellent employment credentials tend to support a finding that Dr. Braude was blacklisted. As described above, Dr. Braude had been employed for ten years by the federal government, was highly thought of by her fellow workers, and was given high evaluations by her supervisors. After her termination by the USIA, Dr. Braude applied for a variety of jobs, including some, such as the typist position at the USIA, that would not be expected to attract applicants with credentials remotely equivalent to hers. Given Dr. Braude's credentials and her persistent efforts during the mid–1950s through the mid–1960s to secure federal employment, it is reasonable to conclude that absent some overriding factor, such as blacklisting, Dr. Braude would have been offered at least one of the federal positions for which she applied.[9]

Next, plaintiff presented evidence that government officials undermined Dr. Braude's employment efforts between the mid–1950s and the mid–1960s. Perhaps the most direct evidence of blacklisting is the USIA's response to a telephone inquiry in the mid–1950s from an individual in a private firm who was considering hiring Dr. Braude. A representative in the USIA personnel office responded to an inquiry as to Dr. Braude's work history by stating that Dr. Braude had been dismissed from the USIA and was on the "black list." There is no direct evidence that USIA representatives provided a similar response to any inquiries from potential federal employers. It is reasonable to conclude, however, based on all of the evidence presented at trial, that from the mid–1950s through the mid–1960s, individuals from at least some of the federal agencies that received Dr. Braude's application, including the USIA, would have been sufficiently impressed with Dr. Braude's credentials to consider hiring her, that these individuals would have made similar telephone calls to the USIA personnel office to inquire about her prior job performance, and that the USIA personnel office would have provided similar responses to any such inquiry from a federal employer as it provided to the private employer.[10]

9. Dr. Braude did not take the Civil Service exam that defendant cites as a reason for Dr. Braude's lack of success in securing a federal position until 1963, nine years after Dr. Braude began her persistent effort to secure federal employment. Moreover, defendant has not established that Dr. Braude's exam grade necessarily would have been a determinative factor in 1963 or in any subsequent year.

10. The political climate changed dramatically during the 1960s and plaintiff has not demonstrated that Dr. Braude's prior termination interfered with her ability to secure any position after the mid–1960s. With respect to the time period

Although plaintiff could not present direct evidence showing similar communications between USIA officials and other federal employers, plaintiff did present evidence that demonstrates that federal agencies did not evaluate Dr. Braude's application for employment strictly on the merits of her capacity to perform the work. In 1965, Dr. Braude applied for a position at the Department of Health, Education, and Welfare (HEW). At that time, there were positions available for which Dr. Braude was well qualified and her application was supported by high ranking HEW officials who knew her personally, including the Assistant and Deputy Assistant Secretary for Administration. HEW, however, did not handle Dr. Braude's application in its usual manner. The agency took an unusually long period of time to act on the application and HEW personnel uncharacteristically refused to keep Dr. Braude's promoters within HEW informed as to the progress of Dr. Braude's application. After rejecting her application, HEW failed to provide specific information to Dr. Braude as to the grounds for her rejection or to suggest how she could improve her chances to secure a position in the future. One of Dr. Braude's supporters within HEW, the Deputy Assistant Secretary for Administration, testified as follows:

[Dr. Braude's] application for employment at HEW was not handled by the agency in the usual manner. Not only did the decision to reject her seem a marked departure from the ordinary hiring decisions, but the agency was also much more secretive—both to her and to me—with her application than it was with most. The only conceivable explanation that I can think of to explain the way [Dr. Braude's] application was handled was that she had covertly been blacklisted.

Also in 1965, individuals who were involved in book publishing and were aware of Dr. Braude's abilities recommended her for a

position at the USIA. Dr. Braude's application for this position resulted in the USIA's Office of Security briefing the Director of the USIA's Information Center Service on Dr. Braude's security record. The Office of Security informed the Director of Dr. Braude's 1953 termination on loyalty and security grounds. In an internal memorandum, the Office of Security noted that the Director determined that given this earlier termination, he would not offer Dr. Braude a position unless she had a "particularly outstanding contribution to make to the [USIA's] mission." Thus, 12 years after the USIA had terminated Dr. Braude, USIA officials considered Dr. Braude's termination a potentially determinative black mark on her record and refused to evaluate her for employment under the same standards as other applicants. Indeed, in a written response to Dr. Braude, the Director of the Information Center Service openly acknowledged that he considered Dr. Braude under a different and harsher standard than other applicants:

I feel sure that if a spot should develop in this or any other agency for which you are especially qualified and needed, the past problems of your Federal employment will not interfere. *But if an opening is suitable for several candidates, including you, all equally available, obviously there could be a tendency to lean toward others.*

(Emphasis added.)

The court's suspicion as to the motives and actions of USIA officials with respect to Dr. Braude is heightened by their seemingly disingenuous actions concerning her termination. As explained above, *see supra* note 7, the USIA intentionally determined not to be forthright with Dr. Braude and not to tell Dr. Braude that she was selected for termination based on loyalty and security concerns. Perhaps even more problematic is the USIA's response, one month after Dr. Braude's termination, to an inquiry from

---

prior to the mid–1960s, to demonstrate that blacklisting did not occur, defendant presented evidence to the effect that no federal agency ever received a copy of Dr. Braude's personnel file. But this evidence would seem to aid plaintiff as much as it would defendant. Because Dr. Braude had excellent credentials, it would be expected that after receiving her application, an

agency would at least consider her prior record, including her personnel file. To the extent that these agencies never requested Dr. Braude's file, a possible implication is that the agencies decided not to pursue Dr. Braude's application any further based on information received from another source, such as a telephone conversation with individuals in the USIA personnel office.

United States Senator Irving M. Ives of New York. The Director of the USIA responded that the USIA terminated Dr. Braude's employment under P.L. 207 when budget restrictions had required elimination of various functions within the USIA and that Dr. Braude was selected for termination because she "could not be utilized effectively in our future program." The USIA internal documents contemporaneous to Dr. Braude's termination that were submitted at trial, however, fail to support that the USIA terminated Dr. Braude's employment either because the functions she performed were discontinued or because she was viewed as less effective in performing her job than other USIA employees. Rather, as explained above, contrary to the USIA's statement to Senator Ives, the trial evidence indicates that the USIA selected Dr. Braude for termination based on loyalty and security concerns.

As described above, the passage of time has prevented the court from hearing testimony from those who could have spoken with some degree of certainty as to why Dr. Braude could not secure federal employment for so many years. As a result, the court must make its determination based on the limited evidence that the parties were able to accumulate. For the reasons set forth above, that evidence indicates that it is more likely than not that USIA officials participated in the blacklisting of Dr. Braude and that such blacklisting prevented Dr. Braude for a period of time from securing federal employment.

## V.

The court's next task under 28 U.S.C. § 2509(c) is to determine whether the facts as determined above form the basis of a legal or equitable claim or rather whether a congressional bill providing compensation to the estate of Dr. Braude would constitute a mere gratuity. The facts do not present a legal claim. A legal claim is "a claim based on the invasion of a legal right." *Spalding & Son, Inc. v. United States,* 28 Fed.Cl. 242, 247 (1993). Plaintiff has not presented any entitlement to compensation for invasion of a legal right because the Court of Claims previously concluded that any such legal claim is barred by the statute of limitations and plaintiff has not contested that conclusion.

The issue of whether plaintiff has presented an equitable claim is considerably more complex. Early decisions of the Court of Claims interpreted Section 2509(c)'s reference to "equitable claim" as, in effect, requiring an assessment by this court of moral responsibility. As explained in *Spalding:*

> In congressional reference actions decided by our predecessor institution, the United States Court of Claims, the view was occasionally expressed that an equitable claim was one that rested on considerations of moral responsibility—"what the Government ought to do as a matter of good conscience." *B. Amusement Co. v. United States,* 148 Ct.Cl. 337, 342, 180 F.Supp. 386, 390 (1960); *Burkhardt v. United States,* 113 Ct.Cl. 658, 667, 84 F.Supp. 553, 559 (1949).

28 Fed.Cl. at 250. If these earlier interpretations are correct and Congress intended that this court in congressional reference actions focus on moral responsibility, then the court concludes that plaintiff has presented an equitable claim that would support a private congressional bill awarding compensation. Based on the evidence submitted at trial, the court concludes that the USIA failed to treat Dr. Braude in the manner in which the United States government, in good conscience, should treat one of its citizens.

The trial evidence does not permit a characterization of the USIA's 1953 termination of Dr. Braude as an act taken in good conscience. The State Department previously had analyzed the very same evidence upon which the USIA based its decision to terminate Dr. Braude and concluded that there was "no reasonable doubt" as to Dr. Braude's loyalty or security risk. This court's analysis of that same evidence positions the court squarely in the same corner as the State Department. Dr. Braude had infrequent and casual social contacts with individuals whose political beliefs were dramatically different from her own. There is no suggestion that Dr. Braude was personally disloyal to the United States, was a security risk, or was sympathetic to any political philosophy not within the mainstream of political thought in

the United States in 1953. Indeed, the record depicts Dr. Braude in many ways as a rather typical American. She cared about others deeply and was loyal to her friends, family, and country. Dr. Braude was interested in political issues but not consumed by them. When confronted with the terror that the Communist Soviet Union had brought to Eastern Europe, Dr. Braude, like so many other Americans, was horrified. Given this picture of Dr. Braude that evolves from the trial evidence, the court concludes that the USIA did not base Dr. Braude's termination on rational concerns about her loyalty or security, but rather simply on guilt by association. The USIA did not terminate Dr. Braude's employment based on her own political beliefs but rather on the political beliefs of a few casual social acquaintances.

Because Dr. Braude's termination was an act that the USIA could not have taken in good conscience, the subsequent blacklisting of Dr. Braude based on these same dubious concerns about loyalty and security demands similar criticism. As to the USIA's failure to reveal to Dr. Braude the true reasons for her termination, the USIA, in good conscience, owed a ten-year federal employee a truthful explanation as to why it selected her for termination. Thus, given the court's conclusions, if Congress intended the phrase "equitable claim" in 28 U.S.C. § 2509(c) to involve general moral principles and to encompass all claims that involve the government owing compensation as a matter of good conscience, then plaintiff has established an equitable claim here.

■ In more recent decisions, however, this court has departed from its interpretation of equitable claim as encompassing all situations involving the government treating an individual in an unfair or immoral way. As explained in *Spalding*:

That view no longer finds favor. The rule now uniformly applied is stated in *California Canners & Growers Ass'n v. United States*, 9 Cl.Ct. 774, 785 (1986): " 'An equi-

table claim on a Congressional reference must rest on some unjustified governmental act that caused damage to the claimants. Absent a finding of negligence [or wrongdoing] on the part of governmental employees, any award … would be a gratuity' " (quoting *Wong v. United States*, Cong.Ref. No. 3–74, slip op. at 12–13 (Ct. Cl. Nov. 23, 1977)).

28 Fed.Cl. at 250.

This modern interpretation appears correct. Judges are nominated and confirmed for their positions based on their skills and experience in addressing legal issues. Judges have no claim to superior experience or judgment with respect to the resolution of moral issues, such as whether a government can take a particular act "in good conscience." Given these limitations on a judge's training and expertise, it would appear that Congress intended the phrase "equitable claim" to cover only situations where there is no adequate remedy at law, the government has engaged in wrongdoing, and the court's evaluation of that wrongdoing involves a legal determination. *See Kerr–McGee Corp. v. United States*, 32 Fed.Cl. 43, 50 (1994). This interpretation would ensure that by asking this court to determine whether an equitable claim exists, Congress would be soliciting an opinion from the court on a topic on which the court can provide expert advice.[11]

## VI.

■ In Count I of its complaint, plaintiff presents two alternative theories, each involving a legal determination, as to why the USIA's termination of Dr. Braude in 1953 constitutes governmental wrongdoing. Plaintiff's first theory is that Dr. Braude's termination was unlawful because it was inconsistent with USIA regulations that obligated the USIA, prior to terminating any employee on loyalty and security grounds, to grant the employee specified procedural rights that were never extended to Dr.

---

11. This interpretation of "equitable claim," of course, would not in any way preclude Congress from enacting a private bill providing for compensation when the relief is based on moral rather than legal principles. The court simply points out that in such a case, Congress would not gain the benefit of any expertise by referring the matter to this court before determining whether to enact a private bill.

Braude. These rights included a statement of charges, an opportunity to respond, a hearing, and a written decision. USIA Personnel Security Regulations §§ 4.1, 4.2, 5.2, 5.3 (1953).

The fatal defect in plaintiff's argument, however, is that P.L. 207 rendered these regulations inapplicable at the time of Dr. Braude's termination. P.L. 207, effective August 7, 1953, provided, in pertinent part:

> [U]ntil January 1, 1954, notwithstanding the provisions of any other law, the Director of the [USIA] ... may terminate the employment of any person ... transferred to or employed by said agency [except persons] entitled to Veterans' preference.

The plain meaning of P.L. 207 rendered the security regulations inapplicable to Dr. Braude's termination because P.L. 207 authorized termination "notwithstanding the provisions of any other law," the security regulations constituted provisions of law, and Dr. Braude's termination occurred within the time period P.L. 207 was in effect.

Plaintiff argues that notwithstanding the broad wording of P.L. 207, Congress did not intend P.L. 207 to reach terminations based on loyalty and security grounds, but rather only to free the USIA from having to comply with reduction-in-force (RIF) procedures. Existing RIF procedures obligated the USIA to make termination decisions using a modified seniority system. But P.L. 207 did not preempt only existing RIF procedures but rather "the provisions of *any* other law" (emphasis added). Congress demonstrated its intention that the preemption language of P.L. 207 extend beyond RIF procedures by specifically including an exception for the laws pertaining to individuals entitled to veterans' preferences. Congress included no similar exception covering regulations for termination based on loyalty and security concerns.

To support its proposed interpretation of P.L. 207, plaintiff cites portions of the legislative history. Although this history demonstrates that some in Congress were concerned only with existing RIF procedures unduly restricting the USIA's termination decisions, the history indicates that others in Congress also focused on loyalty and security concerns. During the course of congressional debates, congressmen expressed their concern that the USIA was infiltrated by Communist sympathizers and that the Director should have the discretion to remove any suspect employees.[12] Indeed, opponents of providing broad authority to the Director to terminate employees argued that existing regulations, which allowed immediate suspension but not immediate termination based on security grounds, gave the Director adequate discretion to address loyalty and security problems. 99 Cong.Rec. 11119 (1953). A proponent of P.L. 207, however, argued that the Director should be given broad authority to address these concerns. 99 Cong.Rec. 11121–22.

Finally, plaintiff relies upon three Supreme Court decisions, each of which involves actions by a federal agency against an employee based on security concerns. *See Cole v. Young,* 351 U.S. 536, 76 S.Ct. 861, 100 L.Ed. 1396 (1956); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). None of these cases, however, supports plaintiff's position.

In *Cole,* a federal agency suspended an employee based upon a statute that allowed summary suspensions when necessary "in the interests of national security." The Supreme Court held that the suspension was improper because the petitioner's government position did not affect national security and hence the petitioner did not fall within the reach of the statute. 351 U.S. at 543, 76 S.Ct. at 866–67. Herein, plaintiff does not dispute that P.L. 207 reached employees in Dr. Braude's position at the

---

12. For example, Rep. Fred E. Busbey of Illinois stated:

> It is utterly impossible for the present administration *ever* to develop a practical, efficient, and effective propaganda campaign as long as it retains on the payroll of the State Department or the International Information Program a single one of the "opposition" Communists who were inherited from the Truman administration, which they found so exceedingly easy to infiltrate.

99 Cong.Rec. 11121 (1953).

USIA. *Service* involved a termination pursuant to the McCarran Rider, a statute that granted the Secretary of State broad discretion to terminate employees summarily when such termination is "necessary or advisable in the interests of the United States." After the enactment of the McCarran Rider and in response to an Executive Order, the State Department adopted regulations that referred to the McCarran Rider and defined procedural rights that the State Department would afford to its employees. In *Service,* the Supreme Court concluded that these subsequently adopted regulations served to limit the discretion that Congress previously had granted the Secretary of State under the McCarran Rider. 354 U.S. at 372, 77 S.Ct. at 1156–57. In the instant case, the security regulations upon which plaintiff relies were adopted prior to rather than subsequent to the enactment of P.L. 207, and hence these regulations could not have been adopted with the intent of limiting the discretion subsequently allowed the USIA Director under P.L. 207. In *Vitarelli,* the Department of the Interior terminated a "Schedule A" employee for national security reasons without providing the procedural safeguards contained in departmental regulations promulgated pursuant to an Executive Order. The Supreme Court acknowledged that Schedule A employees generally could be summarily discharged without the agency giving any reason, but the Court interpreted the regulations as sufficiently broad in scope to grant procedural safeguards to all employees, including Schedule A employees, once the agency announced that the discharge was based on security grounds. Thus, in *Vitarelli,* as in *Service,* the statutory discretion allowed the agency was limited by a subsequent agency regulation. In the instant action, plaintiff has not pointed to any actions by the USIA subsequent to the enactment of P.L. 207 that

limited the USIA's broad discretion under P.L. 207 to terminate employees.[13]

### VII.

Plaintiff's alternative argument in Count I of its complaint is that even if Dr. Braude's termination was consistent with all applicable statutes and regulations, the termination constituted wrongful government conduct because it violated the Fifth Amendment of the Constitution. The Fifth Amendment provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." Plaintiff argues that the USIA deprived Dr. Braude of her liberty interest without providing procedural due process as guaranteed by the Fifth Amendment.[14] Plaintiff relies upon the discussion of the Fifth Amendment liberty interest in *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), in which the Court stated: " 'Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.' " *Id.* at 633 n. 13, 100 S.Ct. at 1406 n. 13 (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971)). Plaintiff then argues that Dr. Braude's good name, reputation, and honor were at stake upon her security discharge.

Courts have carefully scrutinized the procedural process provided to an employee in instances when an agency terminates the employee based on loyalty and security grounds and publicizes those grounds at the time of termination. In assessing whether a violation of the employee's Fifth Amendment liberty interest has occurred, courts have focused on the actual termination of employment, the stigma that attaches when the agency publicizes the

---

13. Plaintiff argues that in the Office of Security memorandum recommending Dr. Braude's termination, the USIA acknowledged that these regulations applied. The memorandum states that Dr. Braude's "case falls under the Personnel Security Regulations, Section 3.1, subsections a(4), (5), c and e." These sections, however, only identify suspect behavior and do not provide any procedural rights. In any event, this statement is merely a conclusion by the Office of Security and

does not constitute a binding legal admission by defendant. The applicability of the regulations is an issue of law to be resolved by this court.

14. At oral argument, plaintiff conceded that the Fifth Amendment's protection of property interests does not apply because Dr. Braude had no property interest in her continued employment at the USIA.

grounds for the termination, and the effect that this stigma has on the individual's ability to secure future employment. *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 894–96, 81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230 (1961); *Wieman v. Updegraff,* 344 U.S. 183, 190–91, 73 S.Ct. 215, 218–19, 97 L.Ed. 216 (1952); *see also Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 186, 71 S.Ct. 624, 655–56, 95 L.Ed. 817 (1951) (Jackson, J., concurring); *Paul v. Davis,* 424 U.S. 693, 706, 96 S.Ct. 1155, 1163, 47 L.Ed.2d 405 (1976). The problem with applying this rationale to the instant case, however, is that the USIA did not publicly announce at the time of termination that Dr. Braude was being terminated on loyalty and security grounds. *See Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976). Budgetary restraints had forced the USIA to terminate employees at the end of 1953 and the USIA did not publicly state that it selected Dr. Braude for termination for other than purely budgetary reasons. Hence, the termination itself did not produce any stigma concerning Dr. Braude's disloyalty to the United States. (Indeed, it took Dr. Braude decades to learn that she in fact had been terminated on loyalty and security grounds.) Because Dr. Braude's 1953 termination did not publicly place her name, reputation, or integrity in question, no stigma attached,[15] and hence the termination did not itself affect Dr. Braude's future employment opportunities and does not raise procedural due process liberty concerns under the Fifth Amendment.

## VIII.

■ Turning next to Count II of plaintiff's complaint and the issue of whether defendant's blacklisting of Dr. Braude constitutes an "equitable claim," defendant proposes the following definition of blacklisting: "[Blacklisting is] a situation in which an individual, or group of individuals acting in concert, disseminates damaging information which affirmatively prevents another person from finding employment." Defendant then concedes that if plaintiff has established blacklisting under this definition, plaintiff has established an "equitable claim" on either of two alternative grounds. Blacklisting would constitute wrongful governmental conduct either because it violated Dr. Braude's liberty interest protected by the Fifth Amendment's due process clause, or because it involved the commission of a tort.

For the reasons set forth generally above, the USIA's conduct fits within defendant's proposed definition of blacklisting. USIA officials disseminated to other federal agencies damaging information and that information affirmatively prevented Dr. Braude from securing federal employment from the mid–1950s through the mid–1960s. There is a question, however, as to whether defendant correctly interprets the controlling case law when it concedes that blacklisting under its definition necessarily constitutes a violation of Dr. Braude's Fifth Amendment liberty interest. *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), arguably suggests to the contrary.

In *Siegert,* as in the instant case, an applicant was unsuccessful in securing federal employment as a result of disparaging remarks made about the applicant by a representative of a federal agency that formerly employed the applicant. As in the instant case, in *Siegert* the unsuccessful applicant brought suit alleging a violation of his Fifth Amendment liberty interest because his prior employer had not provided the applicant with adequate opportunity to contest the allegations that formed the substance of the disparaging remarks. In *Siegert,* the Supreme Court held that no violation of the applicant's Fifth Amendment liberty interest had occurred because damage to reputation by itself is not a liberty interest protected by the Constitution. *Id.* at 233–34, 111 S.Ct. at 1793–94; *Paul v. Davis,* 424 U.S. at 708–09, 96 S.Ct. at 1164. The Court distinguished prior precedent on the ground that the alleged defamation was not "uttered incident" to the petitioner's termination from his prior federal position but rather at a later time

---

**15.** Plaintiff has not established that a termination pursuant to P.L. 207 would itself be stigmatizing.

when the employee was seeking a new position. The Court explained:

> The alleged defamation was not uttered incident to the termination of Siegert's employment by the [federal] hospital ... and the letter [containing the alleged disparaging remarks] was written several weeks later. The statements contained in the letter would undoubtedly damage the reputation of one in [Siegert's] position, and impair his future employment prospects.... But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but is not recoverable in [a suit under the Constitution against the person who uttered the defamatory remarks].

500 U.S. at 234, 111 S.Ct. at 1794. Thus, *Siegert* arguably involves conduct that falls within defendant's proposed definition of blacklisting. The federal agency disseminated disparaging information about an individual and that information affirmatively prevented the individual from securing employment. The Court in *Siegert*, however, did not find a violation of the applicant's Fifth Amendment liberty interest.

The facts in the instant case are distinguishable from *Siegert* and it may be possible to contend that notwithstanding *Siegert*, the USIA's blacklisting of Dr. Braude constitutes a due process violation. It is not necessary, however, for this court to delve deeply into the constitutional nuances of the Fifth Amendment and determine whether *Siegert* can be successfully distinguished because an equitable claim would exist herein even if the Fifth Amendment does not serve as its source. Defendant is correct in its alternative concession that the USIA's blacklisting of Dr. Braude gives rise to an equitable claim because the blacklisting constitutes tortious behavior and a tort constitutes government wrongdoing upon which an equitable claim can be based. With respect to this conclusion, the court makes two observations.

First, the court recognizes that the federal government may not have waived sovereign immunity so as to permit a civil tort action against the United States for blacklisting. Under the Federal Torts Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–2680, the government waives sovereign immunity with respect to some torts but not others. The USIA's actions herein, which the court has classified as blacklisting, can be categorized either as involving some form of defamation or alternatively as an intentional interference with prospective contractual relations. Restatement (Second) of Torts §§ 580B and 766B (1977); *see Su v. M/V Southern Aster,* 978 F.2d 462, 474–75 (9th Cir.1992), *cert. denied,* 508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 244 (1993). The FTCA, however, does not authorize tort claims against the United States for "libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). *See Art Metal–U.S.A., Inc. v. United States,* 753 F.2d 1151, 1153–55 (D.C.Cir.1985) (classifying debarment from government contracting as a claim arising out of interference with government contract rights for which sovereign immunity was not waived under the FTCA).

Although the absence of a waiver of sovereign immunity would preclude a conclusion that blacklisting constitutes a legal claim under 28 U.S.C. § 2509(c), it would not preclude a conclusion that blacklisting gives rise to an equitable claim. As defined above, *see* Section V, an equitable claim requires government wrongdoing and the evaluation of the wrongdoing must involve a legal determination. A determination that a tort has occurred requires a legal determination and tortious actions have long been recognized, under both common and state law, to constitute wrongdoing. The fact that the government has not chosen to waive sovereign immunity so as to permit a civil action against it for a tort cannot change the essential nature of a tortious action as involving wrongful conduct.

Second, in classifying the USIA's conduct as tortious, the court recognizes that honest exchanges of information between former and prospective employers bring important benefits to the economy and to workers generally. Hence, remarks that honestly describe a worker's prior history generally are to be encouraged rather than deemed wrongful and tortious. *See Su,* 978 F.2d at 475 (no

blacklisting exists where information was "accurate and true"); Restatement (Second) of Torts § 772 (no tort exists if "truthful information" is exchanged or "honest advice [is given] within the scope of a request for advice"). But this action does not involve a simple, honest exchange of information. As described generally above, this court concludes that USIA employees did not merely state to other federal agencies considering Dr. Braude's application that Dr. Braude had been terminated for loyalty or security reasons. Rather, the USIA officials went further and stated that Dr. Braude was on the "black list" and therefore should not be considered for hiring. The USIA officials thereby improperly and tortiously interfered with the federal agencies' independent evaluation of Dr. Braude's employment credentials.

### IX.

In Count III of its complaint, plaintiff alleges that defendant improperly concealed from Dr. Braude the true reasons for her termination. Plaintiff, however, has not pointed to any legal requirement that obligated the USIA to provide such information to Dr. Braude. Plaintiff argues that the USIA's concealment prevented Dr. Braude from seeking redress for her termination. But for the reasons set forth above, P.L. 207 unambiguously authorized the USIA's termination of Dr. Braude and any suit by Dr. Braude challenging that termination would not have had a reasonable basis in law. Hence, Count III does not present an equitable claim for compensation.

### X.

The only remaining issue for this court to resolve under 28 U.S.C. § 2509(c) is the amount equitably due to plaintiff from the United States. After reviewing this court's factual findings and legal analysis, the parties should be able to reach an agreement and stipulate as to that amount. The parties shall endeavor to do so. On or before April 8, 1996, in the event a stipulation has not previously been filed, each party shall file a status report setting forth its position and explaining the reasons why the parties were unable to reach a stipulation.

IT IS SO ORDERED.

