**BEAR CLAW TRIBE, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Cong.Ref. No. 92–719X.**

United States Court of Federal Claims.

March 13, 1997.

---

Benjamin R. Graybill, Great Falls, MT, for plaintiff.

Thornton Withers Field, Washington, DC, for defendant. David Moran, U.S. Department of the Interior, of counsel.

Before the Review Panel: ROGER B. ANDEWELT, Presiding Officer, ROBERT J. YOCK and MOODY R. TIDWELL, Judges.

### REPORT OF REVIEW PANEL
PER CURIAM.

I.

Pursuant to 28 U.S.C. §§ 1492 and 2509, the House of Representatives referred to this court a pending bill, H.R. 5784, entitled "For the Relief of the Bear Claw Tribe, Incorporated." H.R.Res. 492, 102d Cong., 2d Sess. (1992). The bill provides for the payment of compensation to the Bear Claw Tribe or its current or former members for any damages arising out of the 1952 sale by the United States of a tract of land known as the Great Falls Subsistence Homestead (the Homestead), located in Great Falls, Montana. In response to this congressional reference, plaintiff, the Bear Claw Tribe, Inc., filed a five-count complaint in this court. Pursuant to the procedures set forth in 28 U.S.C. §§ 2509(a)-(e), this court must determine the facts underlying the referred claim and "inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant."

The complaint initially was considered by a judge of this court serving as the hearing officer under 28 U.S.C. § 2509(a). After the parties conducted discovery, defendant moved for summary judgment. At oral argument on defendant's motion, plaintiff focused in part on the events surrounding the government's original acquisition of the Homestead in the mid–1930s and President Roosevelt's later transfer of responsibility for the Homestead in 1937 to the Department of the Interior (DOI). In response to questions presented by the hearing officer during oral argument, the parties agreed that no additional pertinent information with respect to

these events during the 1930s was available beyond that presented to the court.

In his final report, the hearing officer granted defendant's motion for summary judgment on the ground that the 1952 sale of the Homestead did not rise to a legal or equitable claim against the United States. Alternatively, the hearing officer concluded that even if the sale of the Homestead did give rise to a viable legal or equitable claim, that claim would be barred by the statute of limitations because "plaintiff has not set forth an adequate equitable basis for removing the statute of limitations bar." This action is before this review panel on plaintiff's exceptions to the hearing officer's report. 28 U.S.C. § 2509(d). In its exceptions, plaintiff contends that it possesses a viable equitable claim which is not barred by the statute of limitations. For the reasons set forth below, the review panel concurs in the hearing officer's grant of summary judgment.

## II.

■ The definition of "equitable claim" employed in this court has evolved over time. *Spalding & Son, Inc. v. United States,* 28 Fed.Cl. 242, 250 (1993). The definition now uniformly applied is as follows:

> "An equitable claim on a Congressional reference must rest on some unjustified governmental act that caused damage to the claimants. Absent a finding of negligence [or wrongdoing] on the part of governmental employees, any award ... would be a gratuity."

*California Canners & Growers Ass'n v. United States,* 9 Cl.Ct. 774, 785 (1986) (quoting *Wong v. United States,* Cong.Ref. No. 3–74, slip op. at 12–13 (Ct.Cl. Nov. 23, 1977)); *see also Braude v. United States,* 35 Fed.Cl. 99, 109 (1996); *Shane v. United States,* 3 Cl.Ct. 294, 304 (1983). Plaintiff acknowledges that to establish the unjustified governmental action or wrongdoing necessary to support an equitable claim herein, plaintiff must demonstrate that the government's sale of the Homestead violated some obligation running from the United States to plaintiff. Plaintiff argues, however, that the hearing officer erred in not concluding that the Indi-

an Reorganization Act (IRA), 25 U.S.C. §§ 461–479, created such an obligation.

The IRA, enacted in 1934, authorizes "[t]he Secretary of the Interior ... to acquire, through purchase, relinquishment, gift, exchange or assignment, any interest in lands ... for the purpose of providing land for Indians." 25 U.S.C. § 465. With respect to land so acquired, the IRA imposes on the United States a fiduciary duty to hold that land in trust for the Indians:

> Title to any lands or rights acquired pursuant to [this Act] shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

*Id.; Hydaburg Cooperative Ass'n v. United States,* 229 Ct.Cl. 250, 257, 667 F.2d 64, 67 (1981), *cert. denied,* 459 U.S. 905, 103 S.Ct. 207, 74 L.Ed.2d 166 (1982). The IRA further provides that except under certain narrowly defined circumstances, the United States cannot sell any such Indian lands. 25 U.S.C. § 464. Plaintiff contends that the DOI "acquired" the Homestead pursuant to the IRA and, thus, that the 1952 sale of the Homestead violated the fiduciary duty created by the IRA and thereby constituted governmental wrongdoing sufficient to support an equitable claim under 28 U.S.C. § 2509.

The hearing officer rejected plaintiff's argument on the ground that the IRA covers only title to lands acquired "pursuant to [the IRA]" and the Homestead was not so acquired. The hearing officer analyzed both the United States' original acquisition of the Homestead in the mid–1930s pursuant to an option agreement executed by the DOI, and the President's 1937 transfer within the Executive Branch of responsibility for the Homestead from the Resettlement Administration, an agency within the Department of Agriculture, to the DOI. With respect to the original purchase of the Homestead, the hearing officer concluded that rather than being "pursuant to the [IRA]," the original acquisition was pursuant to the National Industrial Recovery Act (NIRA), 48 Stat. 200 (1933), which plaintiff has not alleged creates a trust or any other legal obligation barring

the United States from selling land acquired thereunder.

As to the 1937 transfer of responsibility for the Homestead, the hearing officer concluded: "When the President transferred oversight of the Homestead back to the [DOI], he once again based his action on the authority granted by the [NIRA]." The hearing officer continued: "Because it is found that the Secretary's authority over the Homestead was governed by the [NIRA] at all relevant times, it follows that the duty to prevent alienation, as imposed by the [IRA], never took effect."

■ Summary judgment is warranted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Grants of summary judgment involve legal determinations, *Douglass v. United Services Automobile Ass'n,* 79 F.3d 1415, 1423 (5th Cir.1996) (en banc), and appellate courts review grants of summary judgment on a *de novo* basis. *See, e.g., Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995); *National Cable Television Ass'n, Inc. v. American Cinema Editors, Inc.,* 937 F.2d 1572, 1576 (Fed.Cir.1991). A review panel in a congressional reference action serves an analogous function to an appellate court, and hence, this review panel will review the hearing officer's grant of summary judgment *de novo.*

### III.

■ Section 208 of the NIRA makes available to the President $25 million for the redistribution of the overbalance of population in industrial centers by making loans or otherwise aiding in the purchase of subsistence homesteads. Section 208 is not directed exclusively at aiding Indians, but rather is directed at the general population. In 1933, the President entered an executive order authorizing the Secretary of the Interior to administer Section 208. The Secretary, in turn, vested the power to establish and administer subsistence homestead projects for Indians in the DOI's Office of Indian Affairs and created the Indian Subsistence Homesteads Authority to make loans and aid in the purchase of such homesteads. On February 13, 1935, pursuant to the NIRA, the DOI entered an option agreement to purchase the land in issue here. On May 15, 1935, the President entered an executive order transferring responsibility for the Homestead from the DOI to the Resettlement Administration. On February 1, 1937, the President entered an executive order transferring responsibility for the Homestead back to the DOI.

In its exceptions to the hearing officer's report, plaintiff does not take issue with the hearing officer's conclusion that the original purchase of the Homestead is properly classified as "pursuant to" the NIRA and not "pursuant to" the IRA. Plaintiff instead focuses on President Roosevelt's 1937 transfer of responsibility for the Homestead from the Resettlement Administration back to the DOI. Plaintiff argues that this 1937 transfer falls within the literal scope of Section 465 of the IRA because the Secretary of the Interior "acquire[d], through ... relinquishment ... land for Indians."

Plaintiff bases its argument primarily on a December 1936 letter from the Secretary of the Interior to President Roosevelt. In that letter, the Secretary asked the President to transfer the Homestead to the DOI and explained that the "Resettlement Administration desires to relinquish responsibility for [this] project[ ]" and that "[i]t is now desired that [this] project[ ] be administered and developed by the Office of Indian Affairs with funds allocated for Indian rehabilitation under the Emergency Relief Appropriation Act of 1935." Plaintiff argues that these statements demonstrate that both the means used to accomplish the transfer and the purpose underlying the transfer coincide with the means and purpose enumerated in the IRA. As to the means used, plaintiff relies upon the Secretary's use of the phrase "relinquish responsibility" and argues that this phrase demands the conclusion that the Homestead was transferred as a result of a "relinquishment," which is one of the means of acquisition specified in Section 465 of the IRA. As

to purpose, plaintiff argues that the Secretary's expressed desire to administer the project for Indian rehabilitation coincides with the purpose behind the IRA which was "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism," *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 152, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114 (1973) (quoting H.R.Rep. No. 1804, 73rd Cong.2d Sess. 6 (1934)).

### IV.

There are two fundamental flaws in plaintiff's argument. First, assuming the proper focus herein is on the actions of the Secretary of the Interior, the Secretary's letter to President Roosevelt is not sufficient to bring the 1937 transfer of the Homestead within the scope of the IRA. Section 465 of the IRA does not mandate that all lands acquired by the Secretary for the benefit of the Indians be held in trust for the Indians.[1] Rather, the trust provision in Section 465 is limited only to lands that are acquired "pursuant to the [IRA]." Hence, to the extent the Secretary acquires responsibility over land pursuant to an authority other than the IRA, the land would not be acquired "pursuant to the [IRA]" and the IRA trust obligations would not apply. Therefore, assuming the proper focus herein is on the actions of the Secretary, the question becomes whether the Secretary's letter to President Roosevelt indicates that the Secretary secured control over the Homestead pursuant to his authority under the IRA. Viewing the letter in its entirety, the review panel concludes that the answer to that question is no.

If the Secretary acquired the Homestead pursuant to the IRA, the nature of the Homestead project would fundamentally change. Plaintiff does not now dispute that when the Homestead was within the domain of the Resettlement Administration, the United States did not hold the land in trust for any particular individuals and could have put the land to alternative uses if it deemed

such a change preferable. For example, the United States could have used the land instead for a project that would benefit a different Indian tribe or even the citizenry at large. An acquisition pursuant to the IRA therefore would change the status quo in that the United States would have a fiduciary duty with respect to the land running directly to a particular group of Indians. In his letter to the President, however, the Secretary fails to express any intent to change the basic nature of the United States' obligations with respect to the Homestead or with respect to plaintiff or its members. The letter mentions other statutes, including the NIRA and the Emergency Relief Appropriation Act of 1935, but nowhere does it mention the IRA. The Secretary's use of the word "relinquish" hardly is sufficient by itself to denote an intention to act pursuant to the IRA. The Secretary's statement that the Resettlement Administration "desires to relinquish responsibility" over the Homestead appears to be nothing more than an explanation to the President that the Resettlement Administration supported the President transferring responsibility for the project to another executive agency. Those words cannot reasonably be interpreted to indicate a specific intent by the Secretary to make an acquisition pursuant to the literal requirements of the IRA when the letter does not even reference the IRA. Rather than indicating that the Secretary intended to change the nature of the government's responsibilities under the Homestead project by acquiring the land pursuant to the IRA, the letter indicates merely that the Secretary wanted the President to exercise his authority and transfer responsibility for an ongoing Executive Branch project to the DOI. Such a transfer would allow the DOI to reestablish control over a project it had originally initiated pursuant to the NIRA.

### V.

Second, in any event, when analyzing whether the 1937 transfer was pursuant to

---

1. By failing to dispute the hearing officer's conclusion that the original acquisition of the Homestead, which was accomplished through an option agreement entered by the DOI, was not "pursuant to the [IRA]," plaintiff would seem to acknowledge that the DOI does not acquire "pursuant to the [IRA]" every time it secures control over land that will be used for the benefit of Indians.

the IRA, the proper focus is not on the actions of the Secretary of the Interior but rather is on the actions of the President. The transfer of responsibility for the Homestead project to the DOI was accomplished by a presidential act, an executive order, and the President had the option to determine the available authority pursuant to which he was mandating the transfer.[2] The executive order transferring responsibility for the Homestead project back to the DOI does not support a conclusion that the President chose to act pursuant to the IRA. The executive order states:

> By virtue of and pursuant to the authority vested in me by Title II of the National Industrial Recovery Act (48 Stat. 200), by the Emergency Relief Appropriation Act of 1935 (49 Stat. 115), and by the Emergency Relief Appropriation Act of 1936 (Public No. 739, 74th Congress), I hereby
>
> 1. Transfer from the Resettlement Administration to the Department of the Interior the following Indian Subsistence Homestead Projects:
>
> 1. Great Falls Homesteads, Cascade County, Montana....
>
> \*   \*   \*   \*   \*   \*
>
> 2. Authorize the Secretary of Interior to administer the property transferred under the preceding paragraph and in connection therewith to exercise all powers and functions previously given to the Administrator of the Resettlement Administration by Executive Order No. 7027 (as amended by Executive Order No. 7200) and by Executive Order No. 7041.
>
> 3. Authorize the Secretary of the Interior to prescribe such rules and regulations as may be necessary to carry out the administrative functions transferred and delegated to him by this Executive Order.

**2.** In response to a question posed by this review panel during the hearing on plaintiff's exceptions to the hearing officer's report, plaintiff's counsel conceded: "I suppose that the President had [the] authority [to grant the transfer either pursuant to the IRA or not pursuant to the IRA]. I wouldn't suggest otherwise."

**3.** Section 201(d) of the NIRA states, in pertinent part:

Hence, like the Secretary's letter, the executive order specifically mentions other statutes, including the NIRA, but makes no reference to the IRA. Also, like the Secretary's letter, the executive order does not suggest that in transferring responsibility for the Homestead to the DOI, the President intended to change the nature of the Homestead project so as to give plaintiff legal or equitable rights with respect to the land that it did not previously possess. In addition, Section 465 of the IRA is directed narrowly at the transfer of land whereas the executive order indicates an intent to transfer responsibility for a complete project ("[t]ransfer ... the following Indian Subsistence Homestead Projects"). Next, by transferring "all powers and functions previously given to the Administrator of the Resettlement Administration," the executive order seems to anticipate that the Secretary will carry on the same functions previously performed by the Resettlement Administration. In contrast, an acquisition pursuant to the IRA would result in a new fiduciary responsibility and hence, in effect, would involve new functions not mentioned in the executive order.

One other argument raised by plaintiff warrants mention. Plaintiff argues that the hearing officer could not properly cite the NIRA to support the 1937 transfer because Section 201(d) of the NIRA terminated all agencies created thereunder two years after the NIRA was enacted in 1933. But Section 201(d) authorized the President to transfer the remaining functions of those agencies to other departments of the government.[3] Consistent with Section 201(d), the President transferred the Homestead project to the Resettlement Administration. Hence, the NIRA envisioned that programs created thereunder would continue to exist more than two years after the date of enactment, albeit under administration elsewhere in the

> After the expiration of two years after the date of the enactment of this Act ... the President shall not make any further loans or grants or enter upon any new construction under this title, and any agencies established hereunder shall cease to exist and any of their remaining functions shall be transferred to such departments of the Government as the President shall designate....

Executive Branch. Plaintiff has not cited any statute that would restrict the President's authority as head of the Executive Branch to later switch responsibility for the program from the Resettlement Administration to the DOI.

In sum, the Secretary did not acquire the Homestead project pursuant to the IRA, but rather pursuant to an executive order. The executive order did no more than transfer authority over an ongoing program from one agency in the Executive Branch to another. It did not invoke the IRA and did not purport to change the government's responsibilities or obligations with respect to the Homestead.

*Conclusion*

As noted above, the parties acknowledge that *no additional pertinent information with respect to the 1937 transfer is available beyond that presented to the court.* Based on the information that is available, the hearing officer correctly determined that there is no material fact in dispute, that the government did not engage in wrongdoing that would give rise to a legal or equitable claim, and hence that summary judgment for defendant is appropriate. Because the review panel agrees with the hearing officer's conclusion that plaintiff does not possess a viable legal or equitable claim, the review panel need not address the hearing officer's alternative ground for granting defendant's motion for summary judgment that even if plaintiff had a viable equitable claim, the claim would be barred by the statute of limitations. Hence, the review panel affirms the hearing officer's grant of summary judgment to defendant and his conclusion that any payment to plaintiff would constitute a gratuity as that term is used in Section 2509.

IT IS SO ORDERED.